

08 CV 9323

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES RETIREMENT SYSTEM, Derivatively and on Behalf of MOODY'S CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>RAYMOND W. McDANIEL JR., JOHN K. WULFF, BASIL L. ANDERSON, ROBERT R. GLAUBER, EWALD KIST, CORNELIUS A. McGILLICUDDY III, HENRY A. McKINNELL JR., NANCY S. NEWCOMB, BRIAN M. CLARKSON, MARK E. ALMEIDA, NOEL KIRNON, ANDREW E. KIMBALL, LINDA S. HUBER, MICHAEL KANEF, STEPHEN TULENKO, JEANNE M. DERING, MICHEL MADELAIN, JOSEPH J. McCABE, CARLTON CHARLES, and BLAIR WORRALL,<br><br>Defendants,<br><br>and<br><br>MOODY'S CORPORATION,<br><br>Nominal Defendant. | **RECEIVED** OCT 30 2008 U.S.D.C. S.D. N.Y. CASHIERS<br><br>Case No. _____<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934<br><br>**<u>Jury Trial Demanded</u>** |

Plaintiff, by its undersigned attorneys, submits this Shareholder Derivative Complaint ("Complaint") against each of the individual defendants ("Defendants") named herein and, nominally, against Moody's Corporation ("Moody's" or the "Company").

## INTRODUCTION

1.     Plaintiff Louisiana Municipal Police Employees Retirement System (the "Retirement System" or "Plaintiff") is a statewide retirement system which provides benefits for

municipal police officers and employees in the state of Louisiana.  The Retirement System brings

this action as a shareholder of Moody's, derivatively on its behalf, against the directors and officers

of the Company responsible for the wrongful conduct described herein during the period from April

1, 2006 to the present (the "Relevant Period").

## OVERVIEW

### "Ratings For Sale"

2.      Moody's is one of the leading credit rating agencies in the world.  Independence and

objectivity are absolute requirements for the credit rating process – without them, a rating is

worthless, adding no value to a rated entity's own (presumably biased) claims about its

creditworthiness.  As such, Moody's depends for its very existence on its reputation for these

qualities.  The Company's famous Aaa (or "triple-A") rating on a debt security has been the gold

standard of safety and creditworthiness for generations.

3.      This action concerns the wholesale corruption by Defendants of the credit ratings

process at Moody's.  During the Relevant Period,  Defendants steered the Company in a "race to the

bottom" in the market for assigning credit ratings, particularly asset-backed securities known as

"structured finance" securities.  At the behest of securities issuers, Defendants consistently rated the

securities far more favorably than they deserved, including thousands which received the coveted

triple-A rating.  Defendants, whose own compensation grew swollen in line with the Company's

revenues, in effect erected a huge sign over Moody's which read:  **"Ratings For Sale."**

4.      As a result of Defendants' misconduct, *trillions of dollars* of highly-risky securities

were sold to investors that should never have seen the light of day.  Beginning in late 2007, Moody's

was forced to "come clean" and downgrade most of these securities.  The rest went into default.  All

of these events have had a hugely magnified effect on the rest of the U.S. financial system. Thus, besides burning Moody's reputation to the ground, *Defendants have helped ignite the greatest financial wildfire this nation has seen since the Great Depression.*

5.       Today, the Company's reputation and future business prospects are in tatters. The Company's share price has been cut to a sliver of its former value. Company executives have been required to testify before Congress and provide evidence to various regulatory agencies and state attorneys general. In hearings as recent as October 22, 2008, one U.S. Congressperson summarized Defendants' actions at Moody's as *nothing less than "a bone-chilling definition of corruption."* Securities lawsuits against, and regulatory investigations of, Moody's have been commenced across the country. Given Defendants' destruction of the Company's primary asset – its reputational capital – there is, finally, the question whether the Company can continue as a going concern.

6.       The Retirement System asserts six claims for relief:  breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Securities Exchange Act of 1934.

7.       Defendants' liability for these violations is unmistakable. According to documents made public by Congress, the Company's Chairman and Chief Executive Officer ("CEO"), defendant McDaniel, admitted to the Board in 2007 that the Company had no internal controls to prevent giving overly favorable ratings to important issuers but, rather, was simply "handing the dilemma off to the team [of managing directors] to solve." McDaniel further admitted that he had offered managers "precious few suggestions" on how to avoid undue influence by issuers and had "just assumed that they would strike an appropriate balance." McDaniel further confided that, when faced with pressures to give inflated ratings, Moody's simply "drank the Kool-Aid," i.e., gave in.

8. Documents and testimony before Congress, as well as published reports, establish further that Defendants systematically terminated employees who raised questions concerning the reliability of Moody's credit ratings, while promoting managers who were the most craven in bowing to pressures from issuers to award high credit ratings. Defendants ignored, or took no meaningful action, in response to either external (i.e., investor-purchasers of Company-rated securities) or internal (i.e., economists and honest analysts employed by the Company) criticisms of the rating process. When it was discovered, in early 2007, that $4 billion worth of structured securities had mistakenly been rated four notches higher than they deserved, Defendants did nothing for almost a year, and then, when Defendants did take action, they concealed their misconduct by simply "gaming" the ratings model, i.e., changing a few inputs so as to produce the exact same (but fundamentally erroneous) rating. Internal memos to Defendants saying things like "Combined, these errors make us look either incompetent at credit analysis or *like we sold our soul to the devil for revenue*" were ignored, while Defendants awarded themselves millions of dollars in bonuses and incentives. All the while, Defendants falsely assured shareholders and the public, through their public statements, that the integrity of the Company's rating process was sound and not tainted by improper influences.

9. For these and other acts of gross misconduct, the Retirement System seeks monetary and equitable relief on behalf of the Company.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under the Securities Exchange Act of 1934, and pursuant to 28 U.S.C. § 1367(a) because all others claims are so related to claims presenting

federal questions that they form part of the same case or controversy.  This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that, upon information and belief, complete diversity exists between the Retirement System and each of the Defendants and the amount in controversy exceeds $75,000.

11.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual with sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because:  (a) Moody's maintains its principal place of business here; (b) one or more of the Defendants either resides in or maintains executive offices here; (c) a substantial portion of the transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiff

13.     Plaintiff Retirement System is, and was during the Relevant Period, an owner and holder of the common stock of Moody's.  The Retirement System is an instrumentality of the State of Louisiana and a resident thereof.

### Nominal Defendant

14.     Nominal defendant Moody's is a provider of credit ratings, research and analysis covering fixed-income securities, other debt instruments, and the entities that issue such instruments in the global capital markets.  The Company is a corporation organized and existing under the laws

of the State of Delaware, with its principal place of business at 7 World Trade Center, 250 Greenwich Street, New York City, New York.

**Individual Defendants**

15.    Defendant Raymond W. McDaniel Jr. ("McDaniel") has been the Chairman of the Board of Directors (the "Board"), as well as CEO, of Moody's since April 2005.  He has held various positions at the Company since 1987, and has been a director since 2003.  In exchange for his purported trust, loyalty, and fidelity to Moody's, McDaniel received $7,376,555 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007, of which $1,873,732 was in the form of restricted stock.  McDaniel also sits on the board of at least one other company, John Wiley & Sons, Inc.  Since April 1, 2006, based upon his knowledge of material, non-public information about the Company, McDaniel has sold 136,444 shares of Moody's stock for $8,795,300.  Upon information and belief, McDaniel is a resident of New York.

16.    Defendant John K. Wulff ("Wulff") has been a member of the Board of Directors since April 2004.  He is Chair of the Audit Committee and a member of the Governance and Compensation Committee.  In exchange for his purported trust, loyalty, and fidelity to Moody's, Wulff was paid $204,307 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007, of which over $100,000 was in the form of restricted stock that vests based on the passage of time, not the achievement of any performance goals.  Wulff also sits on the boards of at least four other companies, Hercules Incorporated, Celanese Corporation, Fannie Mae, and Sunoco, Inc.  Upon information and belief, Wulff is a resident of Vermont.

17.    Defendant Basil L. Anderson ("Anderson") has been a member of the Board of Directors since April 2004.  He is a member of the Audit Committee and a member of the

Governance and Compensation Committee.  In exchange for his purported trust, loyalty, and fidelity to Moody's, Anderson was paid $184,307 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007, of which over $100,000 was in the form of restricted stock that vests based on the passage of time, not the achievement of any performance goals.  Anderson also sits on the boards of at least four other companies, Staples, Inc., Becton Dickinson, CRA International Inc., and Hasbro, Inc.  Upon information and belief, Anderson is a resident of New Jersey.

18.    Defendant Robert R. Glauber ("Glauber") has been a member of the Board of Directors since June 1998.   He is a member of the Audit Committee and a member of the Governance and Compensation Committee.  In exchange for his purported trust, loyalty, and fidelity to Moody's, Glauber was paid $179,305 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007, of which over $100,000 was in the form of restricted stock that vests based on the passage of time, not the achievement of any performance goals.  Glauber sits on the boards of at least three other companies, Freddie Mac, Qandra REIT, and XL Capital Ltd.  Since April 1, 2006, based upon his knowledge of material, non-public information about the Company, Glauber has sold 34,000 shares of Moody's stock for $2,256,000.  Upon information and belief, Glauber is a resident of New York.

19.    Defendant Ewald Kist ("Kist") has been a member of the Board of Directors since July 2004.   He is a member of the Audit Committee and a member of the Governance and Compensation Committee.  In exchange for his purported trust, loyalty, and fidelity to Moody's, Kist was paid $198,055 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007, of which over $100,000 was in the form of restricted stock that vests based on the passage of time, not the achievement of any performance goals.  Kist sits on the boards of at least four other

companies, The DSM Corporation, Royal Philips Electronics, the Dutch National Bank, and Stage Entertainment.  Upon information and belief, Kist is a resident of Maryland.

20.     Defendant Cornelius A. McGillicuddy III ("McGillicuddy") has been a member of the Board of Directors since December 2001.  He is a member of the Audit Committee and a member of the Governance and Compensation Committee.  In exchange for his purported trust, loyalty, and fidelity to Moody's, McGillicuddy was paid $179,305 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007, of which over $100,000 was in the form of restricted stock that vests based on the passage of time, not the achievement of any performance goals.  McGillicuddy sits on the boards of at least six other companies, Darden Restaurants, EXACT Sciences Corporation, Genzyme Corporation, Spirit Aerosystems, Mutual of America Life Insurance Company, and the H. Lee Moffitt Cancer Center, which he chairs.  Since April 1, 2006, based upon his knowledge of material, non-public information about the Company, McGillicuddy has sold 6,450 shares of Moody's stock for $419,000.  Upon information and belief, McGillicuddy is a resident of Florida.

21.     Defendant Henry A. McKinnell Jr. ("McKinnell") has been a member of the Board of Directors since October 1997.  He is Chair of the Governance and Compensation Committee and a member of the Audit Committee.  In exchange for his purported trust, loyalty, and fidelity to Moody's, McKinnell was paid $199,305 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007, of which over $100,000 was in the form of restricted stock that vests based on the passage of time, not the achievement of any performance goals.  McKinnell also is Chairman of the Board of the Academic Alliance Foundation, Chairman of the Connecticut Science

Center, and sits on the Board of Angiotech Pharmaceuticals, Inc.  Upon information and belief, McKinnell is a resident of Connecticut.

22.    Defendant Nancy S. Newcomb ("Newcomb") has been a member of the Board of Directors of the Company since February 2005.   She is a member of the Audit Committee and a member of the Governance and Compensation Committee.  In exchange for her purported trust, loyalty, and fidelity to Moody's, Newcomb was paid $174,025 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007, of which nearly $100,000 was in the form of restricted stock that vests based on the passage of time, not the achievement of any performance goals.  Newcomb sits on the boards of at least two other companies, DIRECTV Group, Inc. and SYSCO Corporation.  Upon information and belief, Newcomb is a resident of Connecticut.

23.    Defendant Brian M. Clarkson ("Clarkson") is the former President and Chief Operating Officer of Moody's Investors Service.  He retired on May 7, 2008.  During the Relevant Period while employed by Moody's, Clarkson headed the Company's structured finance ratings groups and possessed overall responsibility for leading the Company's ratings and research business. In exchange for his purported trust, loyalty, and fidelity to Moody's, Clarkson was paid $3,243,393 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007.  Since April 1, 2006, based upon his knowledge of material, non-public information about the Company, Clarkson has sold 3,643 shares of Moody's stock for $135,520.  Upon information and belief, Clarkson is a resident of New Jersey.

24.    Defendant Mark E. Almeida ("Almeida") is the President of Moody's Analytics.  In exchange for his purported trust, loyalty, and fidelity to Moody's, Almeida was paid $1,724,179 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007.  Since April 1,

2006, based upon his knowledge of material, non-public information about the Company, Almeida has sold 2,026 shares of Moody's stock for $75,367.  Upon information and belief, Almeida is a resident of New Jersey.

25.     Defendant Noel Kirnon ("Kirnon") was, until his termination on July 31, 2007, the Executive Vice President of Moody's and head of its global Structured Finance business.  Upon information and belief, Kirnon is a resident of New York.

26.     Defendant Andrew E. Kimball ("Kimball") is the Chief Credit Officer and Chair of the Credit Policy Committee of Moody's.  Upon information and belief, Kimball is a resident of New York.

27.     Defendant Linda S. Huber ("Huber") is the Executive Vice President and Chief Financial Officer of Moody's.  She has executive responsibility for the Company's global finance activities, including accounting and financial reporting, tax, treasury, business planning, investor relations and internal audit.  In exchange for her purported trust, loyalty, and fidelity to Moody's, Huber was paid $2,749,988 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007.  Since April 1, 2006, based upon her knowledge of material, non-public information about the Company, Huber has sold 7,208 shares of Moody's stock for $365,043.  Upon information and belief, Huber is a resident of New York.

28.     Defendant Michael Kanef ("Kanef") is the Chief Regulatory and Compliance Officer of Moody's.  Previously, he was the Group Managing Director of the Moody's U.S. Asset Finance Group, responsible for ratings of residential mortgage-backed securities.  Upon information and belief, Kanef is a resident of New Jersey.

29.    Defendant Stephen Tulenko ("Stephen Tulenko") is the Executive Director, Global Sales and Customer Service, at Moody's Analytics.  Upon information and belief, Tulenko is a resident of New Jersey.

30.    Defendant Jeanne M. Dering ("Dering") is the Executive Vice President – Global Regulatory Affairs and Compliance of Moody's.  In exchange for her purported trust, loyalty, and fidelity to Moody's, Dering was paid $2,961,370 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007.  Since April 1, 2006, based upon her knowledge of material, non-public information about the Company, Dering has sold 3,373 shares of Moody's stock for $225,000.  Upon information and belief, Dering is a resident of New York.

31.    Defendant Michel Madelain ("Madelain") is the Chief Operating Officer, Moody's Investors Service, of Moody's.  Upon information and belief, Madelain is a resident of New York.

32.    Defendant Joseph J. McCabe ("McCabe") is the Senior Vice President and Corporate Controller of Moody's.  He is responsible for Moody's worldwide accounting and financial reporting activities, including accounting, tax, policies and procedures, internal financial controls, SEC reporting, and compliance with the financial reporting control requirements of the Sarbanes-Oxley Act.  Since April 1, 2006, based upon his knowledge of material, non-public information about the Company, McCabe has sold 1,989 shares of Moody's stock for $101,878.  Upon information and belief, McCabe is a resident of New Jersey.

33.    Defendant Carlton Charles ("Charles") is the Vice President, Treasurer and Chief Operational Risk Officer of Moody's.  Upon information and belief, Charles is a resident of New York.

34.    Defendant Blair Worrall ("Worrall") is the Vice President, Internal Audit, of Moody's.  Upon information and belief, Worrall is a resident of New Jersey.

35.    The Defendants who served on Moody's Board during the events complained of named in paragraphs 15-22 hereof are referred to as the "Director Defendants."  The Defendants who served as officers of the Company during the events complained of named in paragraphs 15 and 23-34 are referred to as the "Officer Defendants."   (Defendant McDaniel is a member of both groups.)

## DERIVATIVE ALLEGATIONS

36.    Plaintiff brings this action derivatively in the right and for the benefit of Moody's to redress injuries suffered, and to be suffered, by Moody's as a direct result of the breaches of federal and state law, fiduciary duty, abuse of control, and gross mismanagement,  as well as the aiding and abetting thereof, by the Defendants.  Moody's is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

37.    Plaintiff will adequately and fairly represent the interests of Moody's in enforcing and prosecuting its rights.

38.    Plaintiff is and was an owner of the stock of Moody's during times relevant to the Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

39.    Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

## DEMAND FUTILE AND EXCUSED

40.     Demand upon the Board of Directors of Moody's that they institute this action in the Company's name would be entirely futile, and is therefore excused.

41.     The Board of Moody's consists of eight (8) individuals:  Defendants McDaniel, Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb.  A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.  Moreover, each faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.

42.     The Director Defendants have already demonstrated their unwillingness to correct the results of Defendants' violation of their duties and harm to the Company's reputation and business prospects.  The Director Defendants cannot be trusted to institute or vigorously prosecute this action.

43.     Through their inaction, acquiescence, and/or affirmative endorsement of the wrongdoing complained of herein, the Director Defendants evinced an attitude throughout the Relevant Period to the effect that, "We don't care about risk" – i.e., the risk to the Company's reputation for accurate credit ratings and to the Company's long-term survival and business prospects.  Among other things, the Director Defendants have failed to take corrective action, institute necessary reforms, or commence legal actions against culpable parties, even when presented with clear evidence throughout the Relevant Period that:

(a)     According to a confidential report by McDaniel to the Board, the Company had no internal controls and procedures to prevent giving overly favorable ratings to

important issuer clients but, rather, was simply "handing the dilemma off to the team [managing directors] to solve";

(b)    According to the same report, McDaniel had offered his managers "precious few suggestions on how to address this very tough problem [avoiding undue influence by issuers], just assumed that they would strike an appropriate balance";

(c)    McDaniel, in the same report, wrote that he thought the Company's practices in assigning overly favorable credit ratings put not only Moody's, but also "the entire financial system," at risk;

(d)    According to McDaniel's report, Moody's, when faced with pressure by bankers, issuers, and investors seeking to influence the credit ratings given by the Company, simply "drank the Kool-Aid," i.e., gave in;

(e)    On September 10, 2007, Clarkson told approximately 100 managing directors of the Company assembled for a "Town Hall"-style meeting that:

> *At the end of the day, I think that we did an okay job in identifying the risk, but we didn't do a very good job of measuring the magnitude. I've been saying that in private meetings. Obviously I'm not going to say that to the press*, but what happened was what we did, we talked about early on how we actually sort of changed our [unintelligible] level with respect to subprime mortgages, 30% over three years. We saw the risk coming. We identified the risk. We just missed the magnitude.

A transcript of the Town Hall meeting was shared with at least one member of the Board of Directors;

(f)    Similarly, responses from several of the managing directors participating in the Town Hall meeting raised serious questions that the Board never addressed. One anonymous commenter wrote (in remarks that were shared with at least one Board member):

*"Really no discussion of why the structured group refused to change their ratings in the face of overwhelming evidence that they were wrong."* (Emphasis added);

(g)     Institutional investors such as PIMCO, Blackrock, Vanguard, and Fortis Investments repeatedly, and in the strongest possible terms, questioned the accuracy and integrity of the Company's credit ratings, to which McDaniel reacted by asking a subordinate, Almeida, what to do;

(h)     Managers in charge of rating $4 billion worth of certain structured securities known as constant proportion debt obligations ("CPDOs"), upon learning that the CPDOs had been erroneously rated Aaa, took no action for almost a year and, when they did take action, it was to *"tweak" the ratings model so as to again (artificially) justify an Aaa rating*;

(i)     There were widespread violations of the Company's Code of Professional Conduct;

(j)     Officers, such as Clarkson, who advocated aggressively keeping issuer clients satisfied, even if it meant degrading credit standards, were systematically promoted and praised, while managers who emphasized real creditworthiness (including dozens who had served under Clarkson) were ostracized, demoted or terminated; and

(k)     No later than 2006, the Company's own economists were predicting a financial "event" that could severely disrupt credit markets.  Thus, in a report published in May 2006, Mark Zandli, an officer of the Company's forecasting division, noted that consumer borrowing had soared, household debt was at a record and a fifth of such debt was classified as subprime. At the same time, according to Zandli's report, loan officers were loosening underwriting standards and easing rates to offer still more loans. Zandli expressed

doubts over the "razor-thin" level of homeowners' equity, an avalanche of "teaser" mortgages and $750 billion of mortgages he judged to be at risk. Zandli concluded: *"The environment feels increasingly ripe for some type of financial event."* (Emphasis added.)

44. The Director Defendants are further incapable of acting independently and disinterestedly in pursuing this action against Defendants, for the following reasons, among others:

45. Defendant McDaniel is a high-level, highly-compensated executive officer of Moody's, and the Company has conceded that he is not independent under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards. In addition, McDaniel was required to testify before Congress regarding his role in lowering Moody's rating standards and other misconduct set forth herein. Accordingly, McDaniel lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

46. Defendant Wulff is acknowledged by Moody's itself to serve as a director of an entity or entities that *are rated by, or have issued securities that are rated by* Moody's, including Fannie Mae, one of the preëminent issuers of structured finance securities. Indeed, Moody's *rates hundreds of billions of dollars' worth of securities issued by companies on whose boards of directors Wulff sits, including Celanese Corporation, Fannie Mae, and Sunoco, Inc.* Wulff thus is conflicted by the goal of ensuring that such entities, and the securities they issue, receive the highest ratings possible from Moody's, irrespective of his duties to Moody's. Moreover, Wulff is a member of several boards of directors of companies that have now been re-rated "D" or below by The Corporate Library (a service which monitors corporate boards on behalf of shareholders), including Fannie Mae.

47.     Defendant Anderson is acknowledged by Moody's itself to serve as a director of an entities or entities that *are rated by, or have issued securities that are rated by* Moody's. Indeed, Moody's *rates billions of dollars' worth of securities issued by companies on whose boards of directors Anderson sits, including Staples and Hasbro.* Anderson thus is conflicted by the goal of ensuring that such entities, and the securities they issue, receive the highest ratings possible from Moody's, irrespective of his duties to Moody's.

48.     Defendant Glauber is acknowledged by Moody's itself to serve as a director of an entities or entities that *are rated by, or have issued securities that are rated by* Moody's, including Freddie Mac, one of the preëminent issuers of structured finance securities, and XL Capital Ltd., one of the preëminent guarantors of such securities. Indeed, Moody's *rates hundreds of billions of dollars' worth of securities issued or guaranteed by companies on whose boards of directors Glauber sits, including Freddie Mac and XL Capital.* Glauber is thus conflicted by the goal of ensuring that such entities, and the securities they issue or guarantee, receive the highest ratings possible from Moody's, irrespective of his duties to Moody's.

49.     Defendant Kist is acknowledged by Moody's itself to serve as a director of an entities or entities that *are rated by, or have issued securities that are rated by* Moody's. Indeed, Moody's *rates billions of dollars' worth of securities issued by companies on whose boards of directors Kist sits, including Royal Philips and Stage Entertainment.* Kist thus is conflicted by the goal of ensuring that such entities, and the securities they issue, receive the highest ratings possible from Moody's, irrespective of his duties to Moody's.

50.     Defendant McGillicuddy is acknowledged by Moody's itself to serve as a director of an entities or entities that *are rated by, or have issued securities that are rated by* Moody's.

Indeed, Moody's *rates billions of dollars' worth of securities issued by companies on whose boards of directors McGillicuddy sits, including Spirit Aerosystems, Darden Restaurants, EXACT Sciences, and Mutual of America Life.*  McGillicuddy thus is conflicted by the goal of ensuring that such entities, and the securities they issue, receive the highest ratings possible from Moody's, irrespective of his duties to Moody's.

51.     Defendant Newcomb is acknowledged by Moody's itself to serve as a director of an entities or entities that *are rated by, or have issued securities that are rated by* Moody's.  Indeed, Moody's *rates tens of billions of dollars' worth of securities issued by companies on whose boards of directors Newcomb sits, including DIRECTV and SYSCO.*  Newcomb thus is conflicted by the goal of ensuring that such entities, and the securities they issue, receive the highest ratings possible from Moody's, irrespective of her duties to Moody's.

52.     Defendant McKinnell was forced to resign as the CEO of Pfizer Inc. in July 2006, and as its Chairman in December 2006, amidst dissatisfaction from the Pfizer Board and declining investor confidence in his leadership abilities.  In fact, McKinnell received record compensation from Pfizer despite a sharply declining value in the share price, a diminished drug pipeline, and steering that company into a series of expensive, stock-for-stock acquisitions.

53.     Seven out of eight members of the Board of Directors of the Company, *viz.*, Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb, serve on the Board's Audit Committee.  Thus, there is no meaningful distinction between the full Board and the crucial committee of the Board charged with auditing and overseeing the Company's accounting and credit rating processes.  The Audit Committee is not independent from the full Board itself and exists

simply to ratify the decisions and preferences of the full Board and its Chairman, defendant McDaniel.

54.     The *same* seven Board members (Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb) also serve on the Governance and Compensation Committee of the Board.  Thus, again, there is no meaningful distinction between the full Board and a key committee of the Board, this one charged with considering and making recommendations concerning the size, structure, composition, and functioning of the Board itself and its committees.  Thus, the Governance and Compensation Committee, too, is not independent from the full Board itself and exists simply to ratify the decisions and preferences of the full Board and its Chairman, defendant McDaniel.

55.     Defendant Anderson is allowed to serve on the Audit Committee despite the fact that he also serves on the audit committees of *three other public corporations*, in direct violation of the director independence rules of the New York Stock Exchange.

56.     As members of the Audit Committee, defendants Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb will take no action against one another or the other member of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Audit Committee Charter and specified herein *infra*, by failing to prevent the breakdown in Moody's internal controls, analytical models, safeguards against conflicts of interest, and compliance with legal and regulatory requirements detailed herein.  Moreover, these members of the Audit Committee defaulted on their responsibility of oversight over the Company's compliance with legal and regulatory requirements as well as its own internal policies and procedures, including the Company's Code of Professional Conduct.

Accordingly, and as evidenced by Defendants' admission that Moody's personnel engaged in conduct contrary to the Company's Code of Professional Conduct, defendants Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb breached their fiduciary duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care. These defendants face a substantial likelihood of liability for their breaches of fiduciary duties, and any demand on them therefore is futile.

57.     As members of the Governance and Compensation Committee, the same faction of defendants Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb will take no action against one another or the other member of the Board of Directors because each member of this Committee breached important specific duties outlined in the Governance and Compensation Committee Charter and specified herein *infra*, by failing to exercise responsibility for overseeing, and make recommendations to the Board regarding, compensation of the Company's senior executive officers and directors; indeed, the very committee charged with governance allows both itself and the Audit Committee to be composed of the same exact bloc of non-employee directors.

58.     The seven non-employee directors, Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb, sit on the boards of a total of twenty-six (26) other companies – with some individually sitting on *six* other boards, in direct violation of the director independence rules of the New York Stock Exchange.

59.     In addition, while Moody's and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct.

These individuals have usurped millions of dollars of regular and bonus compensation, as well as severance payments, stock grants and stock awards as a result of their incompetent performance and deceptive activities.

60.     The Moody's Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of Moody's or its shareholders.  The present Board of Directors of Moody's has refused, and will continue to refuse, to institute this action, among other reasons, because the acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and/or legal violations, and these acts are incapable of ratification.

61.     In addition, certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein, including defendants McDaniel, Wulff, and McKinnell are in a position to, and do, dominate and control the Board of Directors, by virtue of their control of the full Board (McDaniel) or their control of the two primary committees of the Board (Audit, and Governance and Compensation) (Wulff and McKinnell).  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action.

62.     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action.

63.     The Director Defendants also will take no action against one another or against any member of the Board because each of these Defendants received hundreds of thousands of dollars

per year (and McDaniel received over $7 million) in salaries, bonuses, payments, benefits, and other compensation and emoluments in exchange for their purported trust, loyalty and fidelity and as compensation for serving as a member of the Board and as member of the committees thereof.  They have thus benefited from the wrongs alleged herein and have engaged in these wrongs precisely to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with one another and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

64.    The Moody's directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion.  Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability.  They will not do this to themselves or the officers they hired.  The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company.  This derivative suit, brought by shareholders, does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

65.    In addition to the foregoing, the present Board of Directors of Moody's have refused, and will continue to refuse to institute this action because they face debilitating conflicts of interest as a result of their direct complicity in the actions complained of herein, the benefits that they received therefrom, and also as a result of their membership on committees of the Board directly responsible for oversight of the Company.

## FACTUAL BACKGROUND

66.     Moody's, as a credit rating agency and a Nationally-Recognized Statistical Ruling

Organization ("NRSRO"), opines on the creditworthiness of debt instruments and is paid billions of

dollars for doing so.  Together with Standard & Poors and Fitch, Moody's dominates the market for

credit ratings, with 40% of the market going to Moody's alone.  The vast majority of Moody's

revenues derive from its credit rating division, Moody's Investors Service.

67.     As financial markets have grown more complex, the role of credit rating agencies

has mushroomed in importance.  Between 2002 and 2007, large institutional lenders such as Freddie

Mac and Fannie Mae issued a flood of structured securities backed by pools of various underlying

obligations from residential mortgages.  Many of the obligations backing up these securities

consisted of highly risky obligations such as subprime home loans.  By necessity, investors turned to

rating agencies such as Moody's to evaluate and grade the risk associated with each security.

68.     As the need for credit ratings grew, so did the Company's profits, which quadrupled

between 2000 and 2007.  For five years in a row, Moody's had the highest profit margin of any

company in the S&P 500 Index.

69.     Moody's expresses its credit rating evaluations through its famous "Global Scale."

The Global Scale is a categorical scale that runs from Aaa ("triple-A") at the top (obligations

"judged to be of the highest quality, with minimal credit risk") down through progressively riskier

categories: Aa ("double-A") (high quality with very low credit risk); A ("single-A") (upper medium

grade obligations with low credit risk); Baa (moderate credit risk); Ba; B; Caa; Ca; and C.  The Ca

rating is given to obligations that are "highly speculative and are likely in, or very near, default, with

some prospect of recovery of principal and interest").  The C rating is the "lowest rated class of

bonds and are typically in default, with little prospect for recovery of principal or interest." By tradition and regulation, securities bearing ratings of Baa and above are referred to as "investment grade." Throughout the Relevant Period, Defendants falsely claimed that the Global Scale was uniform across all different types of debt securities – including structured finance securities – such that a traditional corporate bond rated Baa had the same risk as a structured security rated Baa.

70.     For investors, a triple-A rating from Moody's has long been the stamp of approval that said that a debt obligation was safe. And for investors in structured securities, that same triple-A rating became the independent validation that turned a pool of risky home loans into an investment grade security.

71.     Since 2004, structured finance has provided the Company with more rating revenue and income than all other product ratings combined (corporate and financial institution debt, sovereign debt, and municipal bonds).

72.     The structured finance market that Moody's depended on for its revenues during the Relevant Period includes a number of different asset-backed securities ("ABS"), including residential mortgage-backed securities ("RMBS:) and commercial mortgage-backed securities ("CMBS"). As their names imply, structured finance securities are backed by assets, and all sorts of assets can form and have formed the basis for these securities, including mortgages, student loans, credit card balances, auto loans, equipment leases, aircraft leases, and even tobacco litigation payments. Furthermore, collections of asset-backed securities such as RMBS can themselves serve as the basis for "second order" structured finance securities that gather together an asset pool of various ABS securities and issue a further round of securities. Most prominent of such second-order

structured finance securities are collateralized debt obligations (CDOs), hundreds of billions of dollars of which are issued each year.

**"RATINGS SHOPPING":**
**DEFENDANTS DESTROY THE OBJECTIVITY**
**AND INDEPENDENCE OF MOODY'S CREDIT RATING PROCESS**

73.     Independence and objectivity are the sine qua nons of the credit rating process. Credit rating agencies act as the "gatekeeper" firms that provide a layer of verification or certification above and beyond a primary entity's own claims about its ability to pay out on its obligations.  Moody's existence as just such a gatekeeper firm, therefore, was predicated on maintaining its independence and objectivity.  To a greatly enhanced degree, the Company's fortunes depended on its reputation.

74.     Ultimately, however, the market for structured finance securities presented many temptations to Defendants that caused them to sacrifice the independence and objectivity of the ratings process for the sake of greater profits at the Company and, consequently, greater riches for themselves.  Several factors, set forth below, led Defendants to breach their fiduciary duties to the Company and its shareholders.

75.     First, Moody's and other ratings agencies were evaluated, retained, and compensated much differently with respect to structured finance securities than with respect to ordinary debt obligations.  In structured finance, Moody's was paid minimal amounts for pre-evaluations of ratings, only receiving the much larger, full payment if the issuer chose to officially use (or "publish") the ratings in connection with the issuance.  As a consequence, issuers were able to select rating agencies on the very basis of their pre-evaluations ("ratings shopping").  Rather than a credit agency determining a credit rating, a credit rating determined the credit rating agencies.

76.    Second, the very configuration of the structured finance securities – *and therefore their profitability to the issuer* – depended on input from credit rating agencies such as Moody's. The structure of such a security is, essentially, an expression of the expected loss determined by the rating agency.  If the agency determines an expected loss of $10 million from a $300 million pool of subprime mortgages, the issuer of a mortgage-backed security will be able to issue more Aaa-rated tranches than would be the case if the agency determined an expected loss of $15 million.  The lower the expected loss, the greater percentage of the total pool that can be issued as higher-rated tranches. And the more of the issuance that is issued as a highly-rated tranche, the more profitable will be the entire issuance to the issuer.  Indeed, even modest changes in the expected loss can produce greatly different overall profitability.

77.     Third, the structured finance market is huge, but the number of issuers is small, being confined to a few giant institutional lenders, such as Freddie Mac and Fannie Mae, and investment banks.  Thus, unlike the situation in which a corporate bond is rated, where the benefit to be gained from awarding an artificially favorable rating to an obligation so as to curry favor with the issuer is outweighed by the harm to Moody's reputation for objectivity that would ensue, the consequences of client displeasure in structured finance were greatly magnified, both qualitatively and quantitatively. Losing one client, for example, could result in losing 10 percent or more of market share – a blow all the larger given the size of the market.

78.    It is axiomatic that issuer would prefer the rating that makes the securitization more profitable for the issuer.  The way this worked in practice is that an issuer such as Fannie Mae would simply select the rating agency that produces the lowest estimate of expected loss, and that agency's

rating would become the official, "published" rating, with all others simply being discarded. Moreover, that rating agency would receive all, or substantially all, of the fees for that issuance.

79.    These features of the structured finance market required Defendants to implement strong control and procedures that would prevent Moody's from:  (a) competing to deliver the highest possible rating to an issuance regardless of real creditworthiness and thereby encouraging issuers to "shop" for ratings; (b) using credit evaluation models that were "gamed" to deliver unrealistically low estimates of expected loss; and (c) allowing profitable relationships with large lenders and investment banks to influence the ratings given to those institutions' securities.

80.    Instead, Defendants permitted a complete breakdown of controls and procedures at the Company throughout the Relevant Period.  Yielding to the temptation to cast objectivity aside, and in a "race to the bottom" to collect as many fees from as many issuers as possible, Defendants implemented processes in which:  (a) artificially high credit ratings were given to structured finance and other securities, and artificially low estimates of expected loss were given to issuers of structured finance securities; (b) models and other analytical tools for determining credit ratings were changed so as to give less weight to reliable inputs and more weight to unreliable inputs and other extraneous information; and (c) the identity, size, and deal volume of particular issuers with Moody's became key components of the ratings assigned to those issuers' securities.

81.    Mark Adelson is the former managing director of structured finance at Moody's.  Mr. Adelson left Moody's in January 2001, after he was reassigned out of the residential mortgage-backed security rating area.  (Mr. Adelson had insisted that ratings of RMBS not employ an inflated value of underlying collateral.)

82.     Six years after being forced out of Moody's, Mr. Adelson testified at a hearing of the U.S. House of Representatives Committee on Financial Services, Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises.  At the hearing, entitled "The Role of Credit Rating Agencies in the Structured Finance Market," Mr. Adelson explained that:

> Another aspect of conflict of interest, though, that's a little different, is that . . . rating agencies can come under a pressure to loosen their standards for a whole sector.  And this can happen from behavior from the issuer called ***"ratings shopping," where an issuer, let's say, shows a deal [i.e., a proposed structured security issuance] to multiple rating agencies and then picks one or two that have the easiest standards to rate the deal.***  Then, the other rating agencies that had tougher standards become invisible.  And what's more, they don't make any money, because the way you make money rating a deal is you rate the deal and charge the issuer.  So it puts pressure on the rating agencies to loosen their standards.

*   *   *

> It is indisputable that securitization issuers in the MBS, CMBS, and CDO areas engage in rating shopping.  They do so openly. [Sept. 27, 2007, emphasis added]

83.     *Portfolio* magazine reported in its September 2007 issue as follows (emphasis added):

> Last year, officials from Moody's Investors Service gave a PowerPoint presentation to a group of mortgage lenders in Moscow.  There were the usual arcana about what the ratings mean and how the agency creates them. . . .

> But midway through the presentation, Moody's revealed a significant, and ultimately more dangerous, role that the agencies play in financial markets.  The slides detailed an "iterative process, giving feedback" to underwriters before bonds are even issued.  ***They laid out how Moody's and its peers help their clients put together complicated mortgage securities before they receive an official ratings stamp.  But this give-and-take can go too far:  Imagine if you wanted a B-minus on your term paper and your high-school teacher sat down with you and helped you write an essay to make that grade.***

*   *   *

> It's becoming clear the rating agencies were far from passive raters, particularly when it came to housing bonds.  With these, the agencies were integral to the process, and that could give regulators and critics the ammunition they've been

looking for to finally force the Big Three to change. The credit-ratings agencies "made the market." [Emphasis added.]

84. On April 11, 2008, the *Wall Street Journal* published an exposé of Defendants' misconduct at Moody's. The article detailed how, as Clarkson was put in charge of a series of different structured finance ratings groups within the Company (e.g., residential mortgage-backed securities, commercial mortgage-backed securities, and CDOs), those groups became more "client-friendly" and consciously sacrificed their ratings standards for the sake of market share:

> A decade ago, as the housing market was just beginning to take off, Moody's was a small player in analyzing complex securities based on home mortgages. Then, Moody's joined Wall Street and many investors in partaking of the punch bowl.
>
> A firm once known for its bookish culture began to focus on the market share that affected its own revenue and profit. ***[Moody's] became willing . . . to switch analysts if clients complained****.* . . . By the height of the mortgage securities frenzy in 2006, Moody's had pulled even with its largest competitor, rating nine out of every ten dollars raised in these instruments. It gave many bonds its coveted triple-A rating.
>
> ***Profits at the 99-year-old firm, which John Moody started to rate railroad bonds, rose 375% in six years.*** The share price quintupled.
>
> Now, Moody's [is] under fire for putting top ratings on securities that ultimately collapsed in value. Investors, many of whom relied on ratings to signal which securities were safe to buy, have lost more than $100 billion in market value. ***The credibility of the ratings system is in tatters as new downgrades of mortgage securities come almost weekly.*** Investigators from Congress, the Securities and Exchange Commission and several state attorneys general are examining the rating firms' practices. [Emphases added.]

85. The *Wall Street Journal* detailed defendant Clarkson's role in the deterioration of the ratings process:

> Of the three big rating agencies, Moody's underwent the deepest cultural change amid the housing boom. At the heart of the firm's gradual transformation into a player in the mortgage game was Brian Clarkson, 51 years old, who joined the company as an analyst in 1991 and became president last August. . . .

* * *

[I]n the mid-1990s, Fitch and S&P were both rating more mortgage bonds than Moody's, in large part because their standards were considered easier. For instance, in commercial mortgage-backed securities, Moody's trailed its two main competitors by 30 percentage points in market coverage in 1996.

That year, Mr. Clarkson took over the group at Moody's that analyzed such securities. The firm added new analysts and overhauled its ratings approach, allowing for higher ratings in the area. Within a year, Moody's moved ahead of both Fitch and S&P in the sector. Rivals said that Moody's had cut its standards. Mr. Clarkson was quoted as calling this "sour grapes." He says now that the change in ratings approach was the right call.

In 1999, Mr. Clarkson took over the part of the firm's structured finance business that oversaw bonds and complex securities based on home mortgages. Moody's rated just 14% of high-quality "prime" bonds in that area the year before he took over, compared with 51% that Fitch rated and 89% that S&P rated . . . .

Moody's top home mortgage analyst at the time, Mark Adelson, took a cautious approach that resulted in fewer triple A ratings. ***Mr. Clarkson shook things up, firing or reassigning about two dozen analysts and hiring new ones who started giving higher grades under a new methodology.*** Mr. Adelson left for an investment bank. In 2001, Moody's market coverage was up to 64%.

* * *

Mr. Clarkson encouraged his people to be more responsive . . . and to find ways deals could get done within Moody's methodologies . . . .

"Brian Clarkson created a dialogue between Moody's and the Street that was good," says Paul Stevenson, a former Moody's executive who now works at BMO Financial Group. But "the most recent problem," he says, "is that ***the rating process became a negotiation***." [Emphases added.]

86.     Consider a Bank of America mortgage deal in early 2001. According to the April 11, 2008, *Wall Street Journal* report, as in most such deals, the vast majority of the securities based on the pool of mortgages would be rated triple-A. The question, however, was how big a chunk would be rated lower – paying higher interest rates and bearing the brunt of any defaults that occurred. Negotiations between Bank of America and Moody's would then ensue, as follows:

A rating committee at Moody's voted to require that the issuer put about 4.25% of the deal's value in the lower-rated section, to provide extra protection for buyers of the top-rated section. *But after Bank of America complained and said it might go with a different rating firm, Moody's reduced the size of the lower-rated chunk slightly – saving the issuer some interest costs – according to people with knowledge of the matter.*

\*   \*   \*

In 2002, Mr. Clarkson's realm extended to the fastest-growing business of CDOs. In this complex product, already-sliced-up bonds are further sliced into new pieces, based on risk and potential return. Moody's was already rating 90% of the dollar value of CDOs. *Mr. Clarkson told an analyst he didn't want bad service to cause that to slip, people familiar with the matter say.*

"There was never an explicit directive to subordinate rating quality to market share," says Mark Froeba, a former Moody's analyst who recently started a bond valuation company that may compete with rating firms. "There was, rather, a palpable erosion of institutional support for rating analysis that threatened market share." . . . [Emphases added.]

87.     Under Clarkson, the Structured Finance group grew to account for approximately 43 percent of Moody's revenue in 2006, up from 28 percent in 1998. By 2006, the Company had more revenue from structured finance – $881 million – than its entire revenue had been in 2001.

88.     Many of the Defendants received enormous profits from degrading the Company's credit ratings. According to the *Wall Street Journal* report:

Employees, though paid a fraction of what they could earn on Wall Street, sometimes grew wealthy from Moody's surging share price and their stock options. According to a regulatory filing, *Mr. Clarkson's compensation totaled $3.8 million in 2006. The firm's chief executive, Raymond McDaniel, earned $8.2 million that year, more than twice what his predecessor made in 2000.* Moody's says the rise in their compensation reflected growth in the overall business, not just the mortgage area, and that much of the rise came from the increasing value of stock options that had been granted years before.

By early 2007, some Moody's analysts were growing worried about the market for securities backed by subprime mortgages. *But Mr. McDaniel told a group of investors in May 2007: "The good-news story for us"*

> *includes "very strong growth coming out of our largest business*, which is the structured-finance business. It is both large and a significant growth engine for the company."
>
> Despite some analysts' concerns, Moody's rated about 94% of the $190 billion in mortgage-related and other structured-finance CDOs issued in 2007, the second busiest year ever. [Emphases added.]

89.     Clarkson, based on his sixteen year record with the Company, including its market share gains and tremendous revenue growth at his hands, received numerous promotions. On August 7, 2007, he was promoted to President and Chief Operating Officer of Moody's Investor Service, "with overall responsibility for leading Moody's ratings and research business." Clearly, Moody's Board of Directors and senior managers, including McDaniel and the Director Defendants, were entirely satisfied with, and ratified and adopted, Clarkson's altered way of doing business.

90.     On May 7, 2008, however, shortly after the *Wall Street Journal* exposé appeared, Moody's issued a press release announcing Clarkson's resignation. Instead of being terminated for cause, Clarkson was allowed to resign voluntarily and received full retirement benefits, including early vesting of his restricted stock.

91.     A further *Wall Street Journal* article, "At Request of Bond Issuers or Bankers, Credit-Rating Firms Switch Analysts," appeared on May 23, 2008. That article revealed that Defendants, at the request of issuers, removed individual structured finance ratings personnel from ratings assignments when issuers deemed such individuals to be "too fussy" or to raise too many questions concerning the security at issue:

> At Moody's, at least one analyst in the group that rated collateralized debt obligations, or CDOs, was moved off a particular investment bank's deals within the past five years after bankers requested an analyst who raised fewer questions about their deals, according to people familiar with the matter.

Another mortgage *analyst at Moody's was moved to the firm's surveillance unit after a Moody's official agreed with an investment banker's opinion that the analyst was too fussy*, a person familiar with the situation said.  The surveillance unit monitors the performance of deals that already have been rated, but doesn't rate new issues.

*    *    *

When business was booming, Wall Street firms prized analysts who moved quickly, since investors were eager to pile into the mortgage market by buying bonds. Analysts who raised doubts about a deal could hurt revenues for the rating firm and investment bank.  [Emphasis added.]

92.     As the above article details, Defendants thereby caused Moody's to completely invert its historical processes of objectivity.  Analysts who faithfully carried out in practice the independent and objective standards that Defendants claimed the Company always maintained were, in fact, removed from the ratings operations precisely because of their exercise of that professionalism.

### "WE DRINK THE KOOL-AID": <br> <u>DEFENDANTS' WILLFUL PARTICIPATION IN THE DESTRUCTION</u>

93.     Defendants' destruction of the integrity of Moody's credit rating process was willful and deliberate.  At minimum, this misconduct evinces Defendants' gross negligence and extreme recklessness with regard to the affairs of Moody's.

94.     For example, institutional investors – the main end users of the Moody's services – repeatedly expressed their frustration with the accuracy and quality of the Company's credit ratings to Company officials.  In July 2007, high-ranking officers at Moody's received comments from four such investors, PIMCO, Blackrock, Vanguard, and Fortis Investments.[1]

---

[1] The source of the allegations contained in ¶¶ 92-105 hereof is documents obtained by Congress and made public during the hearing by the U.S. House Committee on Oversight and Government Reform (Rep. Henry

95.    PIMCO's representative, Josh Anderson, told Defendants that Moody's methodology was "still flawed – and we'll tell you why."  As noted by the Moody's officer, Mr. Anderson then "proposed that we convene a call with 'senior managing directors' at Moody's and investment professionals at PIMCO and they would have an off-the-record discussion of what they still thought were major shortcomings in the methodology and assumptions.  I thanked him for the offer and said that I would follow-up."

96.    Blackrock's representative, Ron D'Vari, told the Moody's officer that (as paraphrased by the Moody's officer referring to Moody's) "We can do a better job to ensure that credit, origination, re-packaging, and structuring have an integrity and that there's proper due diligence at all levels.  *At this point, we have lost control at all stages*."  [Emphasis added.]

97.    Vanguard's representative, Mabel Yu, was emphatic.  The Moody's officers notes of the conversation are as follows:

> *Yu expressed "frustration" with the rating agencies' willingness to "allow issuers to get away with murder."* . . .

> Over the recent months, Yu reports that Vanguard has become less and less comfortable with rating labels.  "It feels like there's a big party out there.  The agencies are giving issuers every benefit of the doubt."  She feels that there's also too much competition between the rating agencies.  "I feel that if Moody's doesn't give the rating, the issuer can simply go elsewhere and get it somewhere else," she said. . . .

> I asked Mabel if she had shared her concerns with anyone at Moody's.  She replied that she had only talked with deal analysts commenting to them that LTV's have gone up, FICO's have gone down, that there are more negative amortization loans, more ARM loans and that rates and default rates have been rising.  "They [the

A. Waxman, Chair).  The documents are available at http://oversight. house.gov/story.asp?ID=2250 (last visited October 28, 2008).

Moody's deal analysts] would always come back with the standard answers: 'we have enough subordination – we've stressed the portfolio.' But I would always wonder if they only stressed the portfolio factor by factor or if they had stressed all the factors simultaneously. *I never got a straight answer," commented Yu.* [Emphases added.]

98.    A different Moody's officer took comments from the representative of Fortis Investments. The comments were memorialized in an e-mail to other officers at Moody's, including Almeida and McDaniel:

All-

I just got off a tough call with Maryam Muessel from Fortis Investments. She's the Chief Investment Officer of Global CDOs. She requested to speak to someone **very senior, very quickly**. She and other investors (blackrock is one of the names she mentioned) have *formed a steering group to try to get the rating agencies to listen to the needs of investors. She is extremely frustrated.* Had a few choice words for me, here's a recap:

"If you can't figure out the loss ahead of the fact, what's the use of using your ratings?"

*"you have legitimized these things" referring to subprime & abs cdos and "leading people into dangerous risk."*

*"If the ratings are b.s., the only use in ratings is comparing b.s. relative to more b.s."*

"luckily I avoided Moody's ratings, didn't buy into your ratings, but 91 sucker managers did and were punished yesterday." [First, bold-only emphasis in the original, all other emphases added.]

99.    The above e-mail was forwarded to Almeida, who forwarded it to McDaniel with the note "Not so good." McDaniel received the e-mail and responded to Almeida on July 13, 2007: "Maybe I should visit and have a high level chat to hear what's on their mind?"

100.    In September 2007, McDaniel participated in a "Managing Director's Town Hall" at which he told fellow high-ranking employees:

The purpose of this town hall … [is] so that we can speak as candidly as possible about what's going on in the subprime market. …

[W]hat happened was, it was a slippery slope. … What happened *in '04 and '05 with respect to subordinated tranches is that our competition, Fitch and S&P, went nuts.* Everything was investment grade. It didn't really matter. …

We tried to alert the market.  We said we're not rating it.  *This stuff isn't investment grade. No one cared because the machine just kept going.*  [Emphases added.]

101.    The following day, a member of the Moody's management team commented as

follows:

We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets. As for #1, it seems to me that we had blinders on and never questioned the information we were given. … As for #2, it is our job to think of the worst case scenarios and model them. … Combined, these errors make us look either incompetent at credit analysis, or *like we sold our soul to the devil for revenue*, or a little bit of both.  [Emphasis added.]

102.    On October 21, 2007, McDaniel typed out an e-mail, which he then sent to himself, in

which he outlined the remarks he would make to the full Board of Directors.  The presentation was

entitled "Credit Policy Issues at Moody's Suggested by the Subprime/Liquidity Crisis."  In the

presentation, McDaniel described what he called a "dilemma" and a "very tough problem" facing

Moody's.

103.    McDaniel's remarks confirm his conscious awareness of (or reckless or grossly

negligent disregard for) and toleration for, debased credit rating standards at Moody's throughout the

Relevant Period, as well as the disregard for his managerial responsibilities:

The real problem is not that the market . . .  underweight[s] ratings quality but rather that in some sectors, it actually penalizes quality by awarding rating mandates based on the lowest credit enhancement needed for the highest rating.  Unchecked, competition on this basis can place the entire financial system at risk.  It turns out that ratings quality has surprisingly few friends: issuers want high ratings; investors don't want ratings downgrades; short-sighted bankers labor short-sightedly to game the ratings agencies for a few extra basis points on execution.

. . . Moody's for years has struggled with this dilemma.  On the one hand, we need to win the business and maintain market share, or we cease to be relevant.  On the other hand, our reputation depends on maintaining ratings quality (or at least avoiding big visible mistakes).  For the most part, we hand the dilemma off to the team [Managing Directors] to solve.  As head of corporate ratings, I offered my managers precious few suggestions on how to address this very tough problem, just assumed that they would strike an appropriate balance.  I set both market share and rating quality objectives for my [Managing Directors], while reminding them to square the circle within the bounds of the code of conduct.

104.    Claiming that the Company had "erected safeguards to keep teams from too easily solving the market share problem by lowering standards," McDaniel then stated:  "This does NOT solve the problem."

105.    Addressing the topic "Rating Erosion by Persuasion," McDaniel went on to state:

Analysts and [Managing Directors] are continually "pitched" by bankers, issuers, investors – all with reasonable arguments – whose views can color credit judgment, sometimes improving it, other times degrading it (*we "drink the kool-aid"*).  Coupled with strong internal emphasis on market share & margin focus, this does constitute a "risk" to ratings quality.  [Emphasis added.]

106.    In November 2007, Moody's Vice Chairman, Christopher Mahoney – whom McDaniel had appointed to lead a Global Financial Risks Perspectives Series, wrote McDaniel that Moody's "has made mistakes" and urged that "the manager in charge of the securitization area should be held to account."  However, it was not that manager's, but rather *Mahoney's*, employment that was terminated by the end of the year.

107.    Throughout the Relevant Period, officers of Moody's repeatedly warned Defendants about the dangers of the debasement of the credit rating system.  Jerome Pons, the former head of the Company's Fundamental Credit Committee, told a Congressional committee on October 22, 2008 (emphasis added):

Mrs. MALONEY:  Mr. Fons, you used to work at Moody's. This document [McDaniel's e-mail of October 21, 2007] appears to contradict years of public statements by Mr. McDaniel and other Moody's officials that they are not pressured by the issuers. And I'd like to ask you, Mr. Fons, are you surprised by this kind of assessment that Mr. McDaniel would be making to his board of directors?

Mr. FONS:  No, I'm not surprised at all.  I mean, *this totally reflected my views and the views of many others at the firm.  Many, of course, didn't want to hear this.* One problem with this whole statement is that the emphasis is on rating quality, and in my view that is something that has never really been clearly articulated by the agencies or by the regulators or by anybody else.  We talk about ratings quality, but there is no clear definition of what that means, and without a firm target there, we don't have much to go on.  But clearly what he is referring to is accurate ratings here. And *we definitely knew that the investors were conflicted in what they wanted in terms of having stable ratings on bonds once they held them, that issuers are conflicted and they wanted high ratings on their securities, whether or not they deserved them, and that bankers were taking advantage of the competition in the industry to game the system.*  [Emphases added.]

108.    Similarly, Mr. Pons also testified, in part, as follows:

Ms. MCCOLLUM:  In this e-mail Moody's officials described a tough phone call with the chief investment officer at Fortis Investments.  The Moody official wrote that the Fortis investor requested to speak to someone very senior very quickly.  She said she was extremely frustrated and had a few choice words, and here's what she told the Moody official:  If you can't figure out the loss ahead of the fact, what's the use of your ratings?  You had legitimized these things, referring to subprime and ABS, that's asset-backed CDO assets, as leading people into dangerous risk.

        *Quote again, "If the ratings are BS, the only use in ratings is to compare BS relatively to BS."*

        Mr. Fons, you used to work at Moody's, so my question for you is going to be that's a pretty damning indictment of the entire system, to use the phrase, and I quote her again, to use only ratings *"compared BS relatively to BS."*

        So my question to you, does Fortis have a point?

Mr. FONS:  *Absolutely.  The deterioration in standards was [palpable].  As I said, evidence first arose at least in 2006 that things were slipping, and the analysts or the managers for whatever reason turned a blind eye to this, did not update their models or their thinking and allowed this to go on.*  And what these investors are most upset about clearly, is the fact that a triple-A was downgraded.

Triple-As had historically been very stable ratings through time.  And so there was an implicit compact, if you will, that the triple-A was to be something that was to last at least for several years without losing that rating.  And when you see something go from triple-A to a low reading in such a short period of time, clearly that's evidence of a massive mistake somewhere.

So she's venting her frustration.

Ms. MCCOLLUM:  So the triple-A is like the gold standard?

Mr. FONS:  It is, yeah. It's the brand.  That's what Moody's is selling.  [Emphases added.]

109.    Mr. Fons issued a searing indictment of Defendants and other managers at Moody's,

who sacrificed their duties to the Company and its shareholders in the pursuit of profits at all costs

(emphasis added):

Mr. SARBANES:  [Turning] to the question of, you can change procedures, you can change controls, you can change people that protocols, et cetera, but why should we trust the same who ignored these warnings to fix the problem in a way means it's not going to happen going forward?

So I think that's what you're getting at. If you could just speak to that a little more specifically, I'd appreciate it.

Mr. FONS:  I think that's exactly what I meant, that you still have the same overall incentives in place, you still have the same structures; and as you said, they should have been doing those things in the first place.  These are not reforms; these are just doing business properly and doing them better.

*So at the governance level you need the board of directors who are actually acting in shareholders' interest and that interest is preserving the franchise and preserving the reputation of the firm.  And I didn't see that happening.  They weren't interested in hiring good businessmen and seeing a business run; and as I said, that's why I have advocated wholesale change at those levels.*  [Emphasis added.]

110.    McDaniel himself seemed ignorant of his fiduciary duties to the Company and its

shareholders.  In testimony before Congress on October 22, 2007, the following exchange occurred :

Ms. SPEIER:  Thank you, Mr. Chairman.  And thank each of you for participating today.  Consumer Reports is a rating agency, and it rates appliances and cars and electronics; and it's well regarded by the consuming public because it's scrupulous about not engaging in conflicts of interest. So I'm going to ask you a couple of questions.  Who do you owe a fiduciary duty to, the issuer or the investor? Just answer it with one word.  Mr. Joynt.

Mr. JOYNT:  I don't know.  Fiduciary responsibility, I'm not sure I can answer that question. So I feel quite responsible to provide our best opinion to investors and everyone in the market.  I don't feel a special responsibility to issuers.

Ms. SPEIER:  Mr. McDaniel?

Mr. MCDANIEL:  *The responsibility is ultimately to the marketplace.*

Ms. SPEIER: To the investor?

Mr. MCDANIEL:  *To the market. The investor is an absolutely critical component of an effectively functioning marketplace, so we must be responsible to the investor.  We also have a responsibility to the overall good operation of the markets themselves.*

Ms. SPEIER:  Mr. Sharma?

Mr. SHARMA:  Trust is the life blood of our franchise, and we see ourselves as the bridge between the issuers and the investors –

Ms. SPEIER:  Just answer the question.

Mr. SHARMA:  Responsibility to the investors is the most critical thing for us. [Emphases added.]

## THE TRUTH BEGINS TO EMERGE

111.    Beginning in 2007, delinquency and foreclosure rates for subprime mortgage loans dramatically increased, creating turmoil in the markets for RMBS backed by such loans and CDOs linked to such securities.   As the performance of these securities continued to deteriorate, Moody's was forced to downgrade the ratings of a significant number the securities.

112.    For example, on July 11, 2007, Defendants caused Moody's to announce that the Company was *downgrading 399 mortgage-backed securities* issued in 2006 and reviewing an additional 32 mortgage-backed securities for downgrade, affecting approximately *$5.2 billion* worth of bonds.  The same day, Defendants also disclosed that the Company had downgraded 52 bonds issued in 2005.

113.    In addition to the foregoing, on August 10, 2007, there were a series of public reports detailing the conflicts of interest in Moody's structured finance business and suggesting that the conflict might have caused inaccurate and inflated ratings by Moody's.

114.    On or about August 20, 2007, Senator Richard Shelby, the head of the U.S. Senate Banking Committee, remarked that credit rating agencies must shoulder some responsibility for the subprime mortgage crisis.  Reports indicated that Moody's was facing Congressional scrutiny for an "inherent" conflict of interest in helping to construct mortgage-backed securities and then opining on their creditworthiness.

115.    As a result of the spreading contagion caused by Defendants' corrupted ratings, the SEC initiated examinations of Moody's and its primary competitors in late August 2007, and the Attorney General for the State of New York, Andrew Cuomo, added Moody's and other rating agencies in his investigation of the mortgage industry.

116.    On  September 21, 2007, Defendants caused Moody's to reclassify many of its "midprime" ratings, further evidencing the inaccuracy and unreliability of its previous rating system.

117.    On September 26 and 27, 2007, there were hearings in Congress concerning the role of Moody's and other rating agencies in the credit crisis.

118.    At the Congressional hearings, several present and former Moody's personnel, including Defendants, faced pointed questions from angry members of Congress.

119.    On October 3, 2007, Defendants caused Moody's to make a disclosure of the structural defects in many of the subprime products that it had rated in 2006.

120.    On October 24, 2007, Defendants announced the Company's quarterly earnings. These earnings were the first to reveal the deterioration of Moody's structured finance business. Defendants reported that "U.S. structured finance performance in the quarter completely offset revenue gains across the other U.S. rating and research business, declining 14% year-over-year. Within U.S. structured finance, revenue growth of 29% from rating commercial mortgage backed securities was more than offset by revenue declines across all other asset classes led by a 52% decrease in revenue from rating residential mortgage backed securities." Structured finance, in short, was visibly dragging the Company down, and defendant McDaniel reduced financial guidance for the entire year as a result.

121.    On February 7, 2008, Defendants released Moody's results for the fourth quarter and full year 2007. The results were dismal and included: (a) a 54 percent profit decline and a 23 percent revenue decline, due in large part to (b) a 25 percent ratings revenue decline, which in turn was driven by (c) a 53 percent reduction in structured finance revenue. Given such steep declines in ratings revenue and especially structured finance ratings revenue, Defendants disclosed that they expected the Company's revenues to *decline* during 2008 "in the low double digit percentage range."

122.    In the earnings announcement, defendant McDaniel stated:

Moody's confronted unprecedented challenges in 2007 as credit problems that began in the U.S. housing sector affected important parts of our ratings business globally. . . . The severity and protracted nature of current credit market dislocations confirms that the challenges of 2007 will persist well into 2008. Moody's is responding to

these conditions by providing more extensive research and credit evaluation tools. We are also working closely with market participants on information transparency in order to restore confidence and to support more orderly credit market operations as quickly as possible.

123.    The New York Attorney General, Mr. Cuomo, saw right through the changes announced by Defendants, and lost no time in saying so.  Mr. Cuomo issued a public statement as follows:  "***The supposed reforms announced . . . by Moody's on Tuesday are too little too late.*** Both S & P and Moody's are attempting to make piece-meal change that seem more like public relations window dressing than systemic reform.  My Office will continue its active investigation of the mortgage industry and the role played by the ratings agencies in the mortgage meltdown." [Emphasis added.]

124.    Four weeks later, on March 11, 2008, Defendants reduced the 2008 guidance they had supplied, as a result of even steeper declines in structured finance ratings revenue.  Defendant McDaniel told a media company investor conference that he expected a decrease in the mid-20-percent range in overall ratings revenue, a substantial increase from previous forecasts.

125.    On May 20, 2008, in an article entitled "Moody's Error Gave Top Rating to Debt Products," the *Financial Times* reported that the Company had incorrectly awarded triple-A ratings to billions of dollars worth of certain asset-backed securities, known as constant proportion debt obligations ("CPDOs"), *and that senior officers knew of this as of early 2007*:

> Internal Moody's documents seen by the FT show that some senior staff within the credit agency knew early in 2007 that products rated the previous year had received top-notch triple A ratings and that, after a computer coding error was corrected, their ratings should have been up to four notches lower.
>
> New of the coding error comes as rating agencies are under intense pressure from regulators and governments, who see failings in the rating of complex structured debt as an integral part of the financial crisis.  While coding errors do occur there is no record of one being so significant.

Moody's said it was "conducting a thorough review" of the rating of the constant proportion debt obligations – derivative instruments conceived at the height of the credit bubble that appeared to promise investors very high returns with little risk. Moody's is also reviewing what disclosures of the error was made.

126.    The *Financial Times* further revealed that, although Defendants had discovered the error in early 2007, they had not only: (a) declined to downgrade ratings until January 2008, but also (b) according to documents, when they finally recognized the error, rather than downgrading the erroneously-rated instruments, *Defendants amended the methodology employed in order to keep the Aaa ratings for the instruments that were originally, and erroneously, assigned.*

127.    *Bloomberg* reported that $4 billion worth of CPDOs were affected, and that some had fallen in value by as much as 90 percent.

128.    On May 21, 2008, Senator Charles Schumer and Representative Paul Kanjorski stated in a letter to the Securities and Exchange Commission ("SEC") that "[t]he news today about Moody's greatly concerns [us] . . . .  Moody's must come forward immediately to explain and clarify what happened. . . .  We also want to know when the Commission learned of these problems and whether it might have affected Moody's application under the 2006 law for continued designation as a [NRSRO]."

129.    That same day, Defendants caused Moody's to disclose that it had retained the law firm of Sullivan & Cromwell and initiated a "thorough external review" of its rating process for the securities.  Defendants represented that they "would take any appropriate actions after the review is completed."

130.    On May 26, 2008, it was belatedly disclosed that the SEC had commenced an investigation into Moody's business practices.  *Reuters* reported as follows:

The U.S. Securities & Exchange Commission (SEC) is looking into the workings of the three main credit rating agencies, prompted by their handling of the subprime crisis and a report of computer errors at Moody's . . . . "We sent letters to Moody's, Standard & Poor's and Fitch asking for them to get back to us on aspects of their methodology," said Erik Sirri, director of the SEC's trading and markets division. "We asked them to explain the policies and procedures used to detect errors in ratings of structured finance products and to tell us about any errors that they found in structured finance products over the last four years, including steps that they followed to correct the problem," he added.

\*   \*   \*

The Financial Times reported last week that Moody's had wrongly assigned triple-A ratings to complex European debt products called constant proportion debt obligations, or CPDOs. Moody's said it rated 44 European CPDO tranches totaling about $4 billion. It said it had hired law firm Sullivan & Cromwell to conduct an investigation into why the coding error in a computer model caused the products to be given a rating four notches higher than they merited.

131.    On June 5, 2008, the New York Attorney General, Mr. Cuomo, announced a

settlement with Moody's and other rating agencies. Mr. Cuomo's press release read in part:

ATTORNEY GENERAL CUOMO ANNOUNCES LANDMARK REFORM AGREEMENTS WITH THE NATION'S THREE PRINCIPAL CREDIT RATING AGENCIES

*Standard & Poor's, Moody's, and Fitch Agree to*
*Change Fee Structures, Obtain Due Diligence Information for the First Time, and*
*Create Due Diligence and Lender Standards for Residential Mortgage-Backed Securities*

NEW YORK, NY (June 5, 2008) - Attorney General Andrew M. Cuomo today announced that he has reached landmark agreements with the nation's three principal credit rating agencies that will fundamentally reform the Residential Mortgage-Backed Securities ("RMBS") market. The agreements with Standard & Poor's ("S&P") Moody's Investors Service, Inc. ("Moody's"), and Fitch, Inc. ("Fitch") will dramatically increase the independence of the ratings agencies, ensure that crucial loan data is provided to the agencies before they rate loan pools, and increase transparency in the RMBS market.

Under the agreements with Attorney General Cuomo, the credit rating agencies will fundamentally alter how they are compensated by investment banks for providing ratings on loan pools. In addition, the ratings firms will all now require for the first time that investment banks provide due diligence data on loan pools for review prior to the issuance of ratings. This will ensure that significant data, which was not

previously disclosed to the rating agencies, will be received and reviewed by them before any bonds are rated.

"The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities. The tremendous reach of this crisis cannot be understated -- our entire economy continues to feel aftershocks from the collapse of the mortgage industry," said Attorney General Cuomo. "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse. The reforms agreed to today by S&P, Moody's, and Fitch should begin to restore investor confidence during what is a very troubling time for the mortgage industry, and I applaud the firms for their cooperation with our investigation."

Residential Mortgage-Backed Securities are bonds issued by large financial institutions backed by pools of individual home mortgages. An investigation by Attorney General Cuomo found that there were certain structural issues in the RMBS market that needed to be reformed in order to help restore investor confidence. These issues included that credit rating agencies were typically only compensated by investment banks if they were selected by the investment banks to provide an ultimate rating on a loan pool.

The agencies were paid no fees during their initial reviews of the loan pools or during their discussions and negotiations with the investment banks about the structuring of the loan pools. Investment banks were thus able to get free previews of RMBS assessments from multiple credit rating agencies, enabling the investment banks to hire the agency that provided the best rating. In addition, the Attorney General's investigation found that credit rating agencies were not privy to pertinent due diligence information that investment banks had about the mortgages comprising the loan pools.

132.    On July 1, 2008, Defendants announced that the Company's "external investigation"

of the European CPDOs had revealed that

members of a European CPDO monitoring committee engaged in conduct contrary to Moody's Code of Professional Conduct.  Specifically, some committee members considered factors inappropriate to the rating process when reviewing CPDO ratings following the discovery of the model error.  According to Moody's Code of Professional Conduct, a committee may consider only credit factors relevant to the credit assessment and may not consider the potential impact on Moody's, or an issuer, an investor or other market participant.

133.    As a result of these "findings," Defendants announced that Moody's had initiated unspecified "employee disciplinary proceedings" with respect to unidentified individuals, and had "accelerated measures to strengthen its rating and monitoring processes."

134.    Later that same day, Defendants announced that Noel Kirnon, the head of the Company's global structured finance business, was "leaving Moody's effective July 31st" for lapses in ratings of the European CPDOs.

135.    The SEC published the results of its examinations of Moody's and its competitors on July 8, 2008.  The Commission identified glaring problems in all processes of the Company's ratings process, including issues of documentation, conflicts of interest, disclosure, adherence to models, policies and procedures, surveillance, and analyst participation in deal terms Among the Commission's findings were the following (bolding and italicization as in the original):

- ***Internal documents at two of the rating agencies [including Moody's] appear to reflect struggles to adopt to the increase in the volume and complexity of the [structured finance] deals.***

- ***Rating agencies [including Moody's] made "out of model adjustments" and did not document the rationale for the adjustment.***

- ***None of the rating agencies examined [including Moody's] had specific written procedures rating RMBS and CDOs.***

- ***Rating agencies [including Moody's] do not appear to have specific policies and procedures to identify or address errors in their models or methodologies.***

- ***The rationale for deviations from the model or out of model adjustments was not always documented in deal records [including at Moody's].***

- ***There was also a lack of documentation of committee actions and decisions [including at Moody's].***

- ***There was sometimes no documentation of committee attendees [including at Moody's].***

- **The Surveilliance Processes Used by the Rating Agencies [including Moody's] Appear to Have Been Less Robust Than Their Initial Ratings Processes**

- ***While each rating agency has policies and procedures restricting analysts from participating in fee discussions with issuers, these policies still allowed key participants in the ratings process to participate in fee discussions.***

- ***Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal [including at Moody's].***

- ***Rating agencies [including Moody's] do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria.***

136.    The United States Congress held hearings on Defendants' misconduct on October 22, 2008.  The proceedings were chaired by Representative Henry A. Waxman, Chair of the House Committee on Oversight and Government Reform.  Among others, Congress heard testimony from defendant McDaniel, and the Committee also examined e-mails and internal correspondence produced by Moody's and its competitors.

137.    Rep. Waxman stated:  "The story of the credit rating agencies is a story of colossal failure.  ***"They broke a bond of trust... and the result is that our entire financial system is now at risk."***  [Emphasis added.]  Rep. Waxman specifically addressed the explanations provided by defendant McDaniel and his cohorts at other ratings agencies:  "In their testimony today, the CEOs of Standard and Poor's Moody's, and Fitch will us that "virtually no one . . . anticipated what is occurring."  **But the documents the Committee obtained tell a different story.**"  [Emphasis added.]

138.    The *Boston Globe* ably summarized the self-serving nature of the testimony by defendant McDaniel and his cohorts:

Deven Sharma of Standard & Poor's, Raymond McDaniel of Moody's Corp., and Stephen Joynt of Fitch Inc. all raised their right hands in oath Wednesday. They proceeded to tell the congressional committee they were caught off guard by the financial disaster that unraveled. Otherwise, they pronounced themselves completely innocent.

139.    One day later, Alan Greenspan, the fabled former Chairman of the Federal Reserve Bank, told Congress that "[t]he . . . surge in global demand for U.S. subprime securities by banks, hedge and pension funds, *supported by unrealistically positive rating designations by credit agencies was, in my judgment, the core of the problem*."  [Emphasis added.]

## "YOUR REPUTATION'S IN TATTERS": THE CONSEQUENCES OF DEFENDANTS' MISCONDUCT

140.    The economic impact on Moody's from Defendants' manipulation of the ratings process will be in the tens, and possibly hundreds, of billions of dollars.

141.    First will be the lost business as a result of Defendants' shredding of the Company's reputation for objectivity and independence, the key "value add" that it brought to the market. Jerome Fons, former chair of the Company's Fundamental Credit Committee, emphasized to Congress on October 22, 2008, the reputational capital that Moody's has lost in Defendants' hands:

Moody's own reputation for independent, accurate ratings sprang from a hardheaded culture of putting investors' interests first. This reputation helped propagate the use of ratings in regulations and investment guidelines. Up until the late 1960's, the firm often refused to meet with rated companies. Published methodologies were all but non-existent and ratings were assigned by an inaccessible, small group of analysts and managers. Even through the mid-1990s, Moody's was considered the most difficult firm on Wall Street to deal with.

142.    Defendants and their colleagues at Moody's admit the destruction of reputational capital at the Company.

143.    On March 11, 2008, defendant McDaniel, in announcing a material reduction in Moody's financial guidance for 2008, stated: ***"I think our reputation has been hurt by what's gone***

*on. I think it would be frankly, disingenuous for me to say it hadn't been. . . . [W]e are a business that really works off of reputational capital more so than others."* [Emphasis added.]

144.    During Congressional hearings in April 2008, a senior managing director in Moody's asset finance group conceded the point as well:

> SEN. SHELBY:  Your reputation's in tatters right now, wouldn't you think, in the financial arena – all the rating agencies are challenged deeply now?  You wouldn't agree to that?
> MS. ROBINSON:  Oh, yeah.  We are challenged at the present time.

145.    During 2007 and 2008, Defendants have made a series of increasingly bleak earnings announcements and revenue forecasts.  As a result of the Company's dependence on ratings revenue from structured finance securities, and the gutting of its reputation of objectivity at the hands of Defendants, overall revenue has taken a gigantic hit.

146.    The market has confirmed the economic import of Defendants' destruction of reputational capital at Moody's.  For example, when the *Financial Times* revealed that Defendants had "gamed" the methodology for assigning ratings to European CPDOs in January 2008 (so as to keep the Aaa ratings that were originally, and erroneously, assigned), the Company's stock price declined $9.40 per share, or 21.4 percent of their remaining value, falling from $43.90 on May 20, 2008 to $34.51 on May 22, 2008.  CPDO issuance was and is a tiny market compared to the nearly one-trillion-dollar subprime RMBS and CDOs that Moody's rated each year.  The market's response to disclosure of Defendants' manipulation, therefore, had nothing to do with the size of the CPDO market but everything to do with the harm to Moody's reputation, trustworthiness, and objectivity.  As Professor John Coffee testified before Congress:

> [Gatekeepers such as Moody's] develop "reputational capital" over many years and many clients that leads investors to rely on them, in part because investors know that the gatekeeper will suffer a serious reputational injury if it is associated with a fraud

or unexpected insolvency. Because this injury should be greater than any amount the issuer can pay the gatekeeper to acquiesce in its fraud, it should deter the gatekeeper from involvement in fraud. From this perspective, "reputational capital" is in effect "pledged" by the gatekeeper in support of the issuer's statements. ***But when the market learns that the gatekeeper failed to uncover fraud or related problems (or that it blinked at them), the resulting loss of confidence, both in the gatekeeper and in the market's mechanisms generally, can produce a sharp decline in stock market values*** . . . . [Emphasis added.]

147. With each lowered earnings announcement and forecast, the Company's stock price has been beaten down. During the relevant period, Moody's stock price has been cut in three – dropping from an all-time high of nearly $75 in February 2007 to just over $21 on October 23, 2008:



148. Second, the Company now faces lawsuits from investors and other parties victimized by Defendants' lies about the creditworthiness of thousands of debt securities. A massive securities class action was commenced in this District, *In re Moody's Corporation Securities Litigation*, No. 1:07-cv-8375-SWK. The Consolidated Amended Complaint filed in the securities action was filed on June 27, 2008, and is *248 pages long*, covering every aspect of Defendants' headlong plunge into tainted ratings and the consequences to Moody's and the U.S. economic system.

149.    Third, the Company will be required to spend millions, and perhaps billions, of dollars in completely cleansing and reforming its credit analysis operations – a financial commitment already undertaken in enacting reforms required by the New York Attorney General as a condition of settlement.  Other regulatory and government agencies that have investigated or are investigating the Company include the SEC, the Attorney General for the State of Connecticut, the Attorney General for the State of Ohio, the International Organization of Securities Commissions, the Committee of European Securities Regulators, and the Financial Stability Forum

150.    Fourth, there is even question Moody's can continue as a going concern.  For example, if, as a result of Defendants' misconduct, the Company's status as an NRSRO is withdrawn, any ratings it issues in the future will not "count" for regulatory purposes.  For example, many regulated financial institutions can only invest in securities bearing certain minimum credit ratings as determined an NRSRO.  If that happens, the Company's market share will plummet from its recent level of approximately 40 percent, down to essentially zero.

## MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING DEFENDANTS' MANIPULATION OF THE CREDIT RATING PROCESS

151.    While privately confessing that the Company's capitulation to rate shopping could endanger not only Moody's and investors, but also the entire U.S. financial system, Defendants maintained the exact opposite stance to the public and its shareholders, including the Retirement System.  Indeed, throughout the Relevant Period, Defendants issued public statements concerning the integrity and reliability of the Company's credit rating process that were devoid of truth and utterly misleading by the omission of material information.

152.    Throughout the Relevant Period, Defendants represented in filings with the SEC, in its Code of Professional Conduct, in the Annual Reports it distributed to Moody's shareholders, in a variety of Moody's Investor Service publications concerning Moody's ratings, and in statements to the financial media, that:  (a) Moody's was an "independent" and "credible" provider of credit ratings; (b) Moody's had adequately disclosed and managed or eliminated the potential conflicts of interest in its ("issuer pays") business model, as required by its Code of Professional Conduct; (c) Moody's did not participate in the structuring of the structured finance securities that it rated, but was sheerly an independent rating organization; (d) the credit ratings Moody's gave to structured finance securities (Aaa, Aa, A, Baa, Ba, B, Caa, Ca, and C) were consistent with, and calibrated to correspond to, Moody's "Global Scale" applicable to traditional debt obligations; (e) Moody's credit ratings reflected all information known and believed to be relevant; (f) Moody's credit ratings were influenced solely by factors relevant to the credit assessment and were not affected by the existence of, or potential for, a business relationship between Moody's and the entities that paid Moody's to provide credit ratings; and (g) Moody's responses to regulators' concerns over the Company's independence had been adequate and had sufficed to allay those concerns.

153.    The above representations were made on the following dates in the following places or formats, among others:

> (a)    Code of Professional Conduct, adopted June 2005, maintained on Company website
> December 2006 Code of Business Conduct, maintained on Company website
> 2006 Form 10-K (Feb. 28, 2007) filed publicly with SEC
> 2006 Annual Report distributed to shareholders in March 2007
> October 23, 2007, Press Release ("Moody's Investors Service Updates Its Code of Professional Conduct")
> 2007 Form 10-K (Feb. 29, 2008) filed publicly with SEC
> 2007 Annual Report distributed to shareholders in March 2008
> Investor Presentation made on May 15, 2008

Investors' Day Presentation made on June 5, 2008 (Waldorf-Astoria)
July 1, 2008, Press Release ("Moody's Investors Service Announced Actions After Review of European CPDO Ratings Process")

(b)    April 12, 2006, Report on Implementation of Code of Professional Conduct, maintained on Company website
2006 Annual Report distributed to shareholders in March 2007
2006 Form 10-K (Feb. 28, 2007) filed publicly with SEC
2007 Annual Report distributed to shareholders in March 2008
October 23, 2007, Press Release ("Moody's Investors Service Updates its Code of Professional Conduct")
2007 Form 10-K (Feb. 29, 2008) filed publicly with SEC
Moody's Code of Ethics (Mar. 25, 2008), maintained on Company website

(c)    Code of Professional Conduct, adopted June 2005, maintained on Company website
April 12, 2006, Report on Implementation of Code of Professional Conduct, maintained on Company website

(d)    April 12, 2006, Report on Implementation of Code of Professional Conduct, maintained on Company website

(e)    Code of Professional Conduct, adopted June 2005, maintained on Company website
April 12, 2006, Report on Implementation of Code of Professional Conduct, maintained on Company website

(f)    Code of Professional Conduct, adopted June 2005, maintained on Company website
April 12, 2006, Report on Implementation of Code of Professional Conduct, maintained on Company website

(g)    Investors' Day Presentation made on June 5, 2008 (Waldorf-Astoria), maintained on Company website
August 7, 2007, Press Release ("Moody's Corporation Announces New Business Unit Structure")
2007 Annual Report distributed to shareholders in March 2008
Investor Presentation made in July 2008, maintained on Company website
Investor Presentation made on Aug. 11, 2008, maintained on Company website
Presentation by Huber at William Blair Growth Conference, June 17, 2008, maintained on Company website
Presentation by McDaniel on Moody's First Quarter 2008 Earnings Call, Apr. 23, 2008, maintained on Company website

Moody's Second Quarter 2008 Earnings Call, July 30, 2008, maintained on
Company website

Specific statements containing the misrepresentations are set forth in Exhibit A to this Complaint.

154.    None of the above repeated representations were true, and together they created a picture of the state of affairs that was falsely and materially better than the one that actually existed. In truth, as set forth herein:  (a) Moody's was not operating as an "independent" and "credible" provider of credit ratings, but rather, its independence and credibility had been systematically compromised; (b) Moody's had declined to manage, let alone eliminate, its conflicts of interest; (c) Moody's did participate in the structuring of the structured finance securities it rated; (d) the credit ratings that Moody's bestowed on structured finance securities (Aaa, Aa, A, Baa, Ba, B, Caa, Ca, and C) were not consistent with Moody's "Global Scale" applicable to traditional debt obligations; (e) Moody's credit ratings failed to reflect all information known and believed to be relevant; (f) Moody's credit ratings were not influenced by factors relevant to the credit assessment and were affected by the existence of, or potential for, a business relationship between the Company and the entities that paid it to provide credit ratings; and (g) Defendants' undisclosed destruction of the integrity of the Company's ratings processes were exposing Moody's to significant regulatory scrutiny and punishment, now being realized after Defendants' misconduct came to light and  their misrepresentations were revealed as such.

## LOSS CAUSATION:
## AS THE TRUTH EMERGES, MOODY'S STOCK PRICE IS CUT IN THREE

155.    The Company's stock price declined steadily and steeply as the truth of Defendants' destruction of Moody's rating process was revealed throughout the Relevant Period.

156.    Among the disclosures that contributed to the emergence of the truth were the following:

(a)    On July 12, 2007, Moody's announced its first large wave of subprime RMBS downgrades, which gave the market reason to believe that Moody's prior ratings were materially inflated.  Similarly, on July 24, 2007, Moody's issued a report on subprime losses. As the market digested this news, the share price dropped from $66.80 on July 12, 2007 to $53.80 on July 31, 2007 – a loss of nearly 20 percent of its value.

(b)    On August 10, 2007, there were a series of public reports detailing the conflict of interest in Moody's structured finance business and suggesting that the conflict might have caused inaccurate and inflated ratings by Moody's.  On August 20, 2007, Senator Richard Shelby, head of the U.S. Senate Banking Committee, remarked that credit rating agencies such as Moody's must shoulder some of the blame for the subprime mortgage crisis.  Reports noted that Moody's was facing Congressional scrutiny for "inherent" conflicts of interest in helping to construct mortgage-backed securities and then issuing ratings on them.  The share price declined $3.90 that day, Moody's largest single-day decline in over a year.  Between August 10, 2007, and September 17, 2007, the share price declined from $54.70 to $42.87 – *another 20 percent drop in just a month and a half.*

(c)    On May 21, 2008, the market digested the *Financial Times*'s report the previous day of Defendants' manipulation and subsequent cover-up of the European CPDO ratings process.  When such concrete evidence was revealed, Moody's share price spiked sharply downward, dropping from $43.90 on May 20, 2008, to $34.51 on May 22, 2008 – *yet another 20 percent drop.*

(d)     Finally, in late October 2008, the "last shoe dropped."  As the market heard defendant McDaniel drilled by members of Congress and reviewed the incriminating e-mails showing Defendant' awareness and willful deception of investors, it lopped *yet another 20 percent off of Moody's stock price* – dropping it from $24.30 on October 21, 2008, to $19.29 on October 24, 2008.

157.    The drop in Moody's share price during the Relevant Period cannot be explained by reference to broader factors operative in the wider stock market or among comparable companies in the same industry.  For example, during the Relevant Period (until October 24, 2008), the share price of Moody's declined 73 percent, while the S&P 500 Index declined only 36 percent.  Moreover, for most of the Relevant Period, the S&P 500 Index outperformed Moody's by a substantially wider margin.

## INSIDER SELLING

158.    Between April 1, 2006 and the present, during the height of Defendants' debasement of the credit ratings process at Moody's, and before disclosure of Defendants' wrongdoing, defendants McDaniel, Glauber, McGillicuddy, Clarkson, Almeida, Huber, Dering, and McCabe (the "Insider Selling Defendants"), while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability, sold approximately $12,373,108 in Moody's stock on the basis of their inside information.

159.    Each of the Insider Selling Defendants sold stock in the amounts set forth in paragraphs 15, 18, 20, 23, 24, 27, 30, and 32, *supra.*

160.    The sales by the Insider Selling Defendants constituted a breach of their fiduciary duties to the Company.  In addition, it violated Moody's corporate policy as contained in the Company's Code of Professional Conduct, its Code of Business Conduct, and its Code of Ethics.

## DEFENDANTS' BREACHES OF DUTY

161.    Defendants had clear duties to Moody's and its shareholders.  These duties: (a) arose by operation of law, and/or (b) were imposed upon them by the Company.  Moreover, (c) Defendants breached their duties as set forth in this Complaint.

### A.    General Duties at Law

162.    By reason of their positions as officers, directors, and/or fiduciaries of Moody's and because of their ability to control the business and corporate affairs of the Company, Defendants owed Moody's and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care, and were and are required to use their utmost ability to control and manage Moody's in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Moody's and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

163.    Moreover, as officers and/or directors of a publicly-held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

164.    To discharge their legal duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, Defendants were required, among other things, to:

(i)    refrain from acting in any manner so as to favor their personal interests at the expense of the best interest of the Company and its shareholders;

(ii)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate information to shareholders, the investing public, and the SEC;

(iii)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(iv)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial and operational controls such that the Company's financial reporting would be true and accurate at all times;

(v)    remain informed as to how Moody's conducted its operations and, upon receipt or notice of information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(vi)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations;

(vii)     ensure that conflicts of interests and other features impairing the integrity of the credit rating process at the Company were eliminated;

(viii)     ensure that no inaccurate financial information about Moody's was released to the public that would tend to artificially inflate the price of Moody's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

(ix)     ensure that valuable corporate assets would not be wasted in payments of excessive compensation to officers who ruined the financial health and stability of the Company.

### B.     Specific Corporate Duties

165.     In addition to their general duties at law described above, Defendants were obligated to abide by the specific corporate duties set forth in governing corporate documents.

166.     Moody's had a "Code of Professional Conduct" applicable to the entire Company, including Defendants.  The purpose of the Code of Professional Conduct was "to protect the integrity of the rating process, to ensure that investors and issuers are treated fairly, and to safeguard confidential information provided to us by Issuers."  Among others things, the Code of Professional Conduct required Defendants to:

- Develop and maintain rigorous and systematic rating methodologies;

- Apply a given methodology in a consistent manner;

- Determine credit ratings by rating committees and not by an individual analyst;

- Avoid issuing any credit ratings that knowingly contained misrepresentations or otherwise misrepresented the issuer's creditworthiness;

- Invest resources sufficient to carry out high-quality credit assessments of issuers or obligations;

- Comply with all applicable laws and regulations governing their activities;

- Use care and professional judgment to maintain both the substance and appearance of independence and objectivity;

- Determine credit ratings only by factors relevant to the credit assessment;

- Not let the credit rating assigned to an issuer or obligation be affected by the existence of, or potential for, a business relationship between Moody's and the issuer or any other party;

- Refrain from determining credit ratings based on the potential effect (economic, political, or otherwise) of the rating on Moody's, an issuer, an investor, or other market participant;

- Identify and eliminate, manage, or disclose actual or potential conflicts of interest that may influence the opinions and analyses Moody's made;

- Make complete, timely, clear, concise, specific, and prominent disclosures of known and potential conflicts of interest;

- Disclose the general nature of Moody's compensation agreements with rated entities;

- Not allow analysts who were directly involved in the rating process to initiate, or participate in, discussions regarding fees or payments with any entities they rated;

- Not evaluate or compensate analysts on the basis of the amount of revenue Moody's generated from issuers that the analyst rated or regularly interacted with; and

- Publicly disclose any material modifications to the Company's rating methodologies and related significant practices, procedures, and processes.

As detailed in this Complaint, Defendants, in fact, violated every single one of these duties.

167.    Moody's also had a general "Code of Ethics" applicable to every employee, including Defendants.  Among other things, the Code of Ethics laid down duties in the areas of employee relations, ethical business practices, confidentiality, conflicts of interest, corporate opportunities, privacy, security, insider trading, fair dealing, and the integrity of business processes.

168.    Moody's had a special Code of Ethics for its CEO and senior financial officers.  This Code of Ethics required the officers to "engage in and promote honest and ethical conduct and abide by the Moody's Code of Business Conduct and other Company policies and procedures . . . ."

169.    The senior officers' Code of Ethics had a section labeled "Conflicts of Interest," which provided:

> Your obligation to conduct the Company's business in an honest and ethical manner includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. No Senior Officer shall make any investment, accept any position or benefits, participate in any transaction or business arrangement, or otherwise act in a manner that creates or appears to create a conflict of interest unless the Senior Officer makes full disclosure of all facts and circumstances to the General Counsel and the Chairman of the Audit Committee of the Board of Directors . . . , and obtains the prior written approval of the full Board of Directors.

170.    In addition, the charters of the various committees of the Company's Board imposed enhanced duties on the Director Defendants sitting on those Committees.

171.    Pursuant to its Charter, the Audit Committee was responsible for assisting the Board in at least the following:

> fulfilling its oversight responsibilities relating to: (a) the integrity of the Company's financial statements and the financial information provided to the Company's shareholders and others; (b) the Company's compliance with legal and regulatory requirements; (c) the Company's internal controls; and (d) the audit process, including the qualifications and independence of the Company's principal external auditors . . . and the performance of the Company's internal audit function and the Independent Auditors. The Committee also oversees the preparation of the report

required by the Securities and Exchange Commission's rules to be included in the Company's annual proxy statement

172. The Audit Committee had the following specific duties:

- Review with independent auditors the adequacy of the Company's internal and external financial reporting processes;

- Review the planned scope and results of internal and external audits;

- Review significant changes in accounting principles and any significant disagreements between management and outside auditors with respect to information contained in financial statements;

- Receive reports regarding, and review with external auditors, internal auditors and management, "the adequacy and effectiveness of: (a) the Company's internal controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Committee by the [external auditors] or management; and (b) the Company's disclosure controls and procedures";

- Oversee the Company's compliance program by reviewing: "(a) legal and regulatory compliance matters; and (b) the Company's policies and procedures designed to promote compliance with laws, regulations and internal policies and procedures, including the Company's code of conduct";

- Review the Company's policies with respect to risk assessment and risk management;

- Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company "regarding accounting, internal accounting controls and auditing matters, including procedures for confidential, anonymous submission of concerns by employees regarding accounting and auditing matters"; and

- Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company.

173. Pursuant to its Charter, the Governance and Compensation Committee had the

following duties and responsibilities:

(a) develop and recommend to the Board a set of corporate governance principles;
(b) perform a leadership role in shaping the Company's corporate governance; (c)

identify individuals qualified to become Board members, consistent with criteria approved by the Board; (d) recommend to the Board director candidates for the annual meeting of stockholders; (e) have direct responsibility for overseeing, and make recommendations to the Board regarding, compensation of the Company's senior executive officers and directors; and (f) be responsible for overall administration of employee benefit plans.

174.    Finally, Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, this required Defendants to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that:  (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

## C.    Defendants' Breaches of Duties

175.     The conduct of the Defendants complained of herein involved knowing violations of, or reckless disregard for, their duties as directors and officers to the Company and its shareholders.

176.    Through action or inaction, Defendants breached their legal duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care – as well as their specific corporate duties – by, among other things:

(a)     causing the Company to engage in a "race to the bottom," i.e., a competition to deliver the highest possible ratings to the greatest number of issuances of securities regardless of real creditworthiness and thereby encouraging issuers to "shop" for ratings;

(b)     causing the Company to use credit evaluation models that were "gamed" to deliver unrealistically low estimates of expected loss;

(c)     allowing profitable relationships with large lenders, investment banks, and other issuer clients to influence the ratings given to those institutions' securities;

(d)     causing the Company to award artificially high credit ratings to securities, and artificially low estimates of expected loss;

(e)     causing the Company to secretly change models and other analytical tools for determining credit ratings so as to give less weight to reliable inputs and more weight to unreliable inputs and extraneous information;

(f)     allowing the identity, size, and deal volume of particular issuers with Moody's to became key components of the ratings assigned to those issuers' securities;

(g)     causing the Company itself to participate in the structuring and deal terms of structured securities while falsely assuring shareholders and the public that it was acting simply as a neutral and independent rater of creditworthiness;

(h)     compromising the independence and credibility of ratings by demoting or transferring analysts from ratings assignments based purely on subjective issuer displeasure without regard to those analysts' job performance and integrity;

(i)       disregarding obvious signs that senior managers, including McDaniel, were unwilling or unable to correct the misconduct set forth herein, and failing to remove them from office or appoint managers who could correct the problems;

(j)       disregarding warnings from investors, customers, economists, and employees alike that the Company was proceeding down an unprecedented path of risk to its reputation and financial prospects through the assigning of fraudulent credit ratings;

(k)       allowing managers who had direct culpability for the corrupted ratings to resign or retire from the Company with full benefits;

(l)       causing the Company to pay dividends on its common stock at times when its financial prospects were skidding downward and its potential losses and liabilities were skyrocketing;

(m)       causing the Company to wrongfully terminate the employment of officers and managers who criticized the Company's practices in assigning credit ratings to structured finance and other securities;

(n)       when credit ratings of various securities were found to be incorrectly high, failing to correct those ratings or downgrade the securities promptly, and manually and retroactively changing the proprietary model by which the ratings were determined so as to provide an ad hoc justification for the old, incorrect ratings;

(o)       tolerating a gross lack of documentation of how and why various securities received various ratings;

(p)    knowingly and foreseeably sacrificing the Company's reputation and reputational capital for the sake of immediate profits to the Company and the payment of heightened salaries, bonuses, and other compensation to themselves;

(q)    falsely representing to shareholders and the public that the Company was an "independent" and "credible" provider of credit ratings;

(r)    falsely representing to shareholders and the public that the Company had adequately disclosed and managed or eliminated the potential conflicts of interest in its business model;

(s)    falsely representing to shareholders and the public that the Company did not participate in the structuring of structured finance securities that it rated;

(t)    falsely representing to shareholders and the public that the credit ratings given to structured finance securities were consistent with, and calibrated to correspond to, the Company's Global Scale applicable to traditional debt obligations;

(u)    falsely representing to shareholders and the public that the Company's credit ratings were influenced solely by factors relevant to the credit assessment and were not affected by the existence of, or potential for, a business relationship between the Company and its issuer clients;

(v)    falsely representing to shareholders and the public that the Company's responses to regulators' concerns over the Company's independence were adequate and had sufficed to allay those concerns;

(w)    knowingly tolerating inadequate or nonexistent risk management policies and procedures;

(x)     knowingly tolerating inadequate or nonexistent internal controls to prevent inaccurate or tainted credit ratings from being assigned;

(y)     knowingly tolerating inadequate or nonexistent internal controls to prevent conflicts of interest from affecting the objectivity of credit ratings assigned; and

(z)     failing to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.

177.     Defendants were aware of, or recklessly disregarded, the fact that their breaches of duties posed a risk of serious injury to the Company. The conduct of the Defendants who were officers of the Company during the Relevant Period was ratified by the remaining Defendants who collectively comprised all of Moody's Board during the Relevant Period.

178.     Furthermore, the Director Defendants, as members of the respective committees of the Board, had special duties that included knowing and understanding the material information as set out in the charters of each of the respective committees, which provides that each committee's responsibilities include: (i) overseeing evaluation of the Company's internal accounting controls; (ii) reviewing the Company's financial reports and accounting standards and principles; and (iii) overseeing internal audits. It was also the duty and responsibility of the Audit Committee to communicate the results of its exercise of reasonable judgment to the full Board of Directors and for the full Board to ultimately monitor and oversee the Audit Committee itself.

179.     The Officer Defendants had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, the Director Defendants had a duty to discuss this material information with management

and fellow directors at any of the Board's meetings or at any of the meeting of the committees of the Board.

180.     The Defendants' conduct as set forth herein constituted conscious misbehavior and recklessness.  Each of the Officer Defendants was charged with overseeing the risk, valuation, and integrity of the Company's credit rating process, and each of the Director Defendants was not only responsible for the Company's financial well-being as a whole but also sat on one or more committees of the Board specifically requiring him or her to be actively involved in the oversight of the officers managing the Company's credit rating process:  (a) Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb (Audit Committee); and (b) Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb (Governance and Compensation Committee).  Each of these Committees did, in fact, purport to actively direct and control the Company's affairs during the Relevant Period.  In 2007, the full Board met six times, the Audit Committee met eight times, and the Governance and Compensation Committee met six times.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

181.     At all relevant times, as a result of their membership in the Board, various Committees of the Board, and/or senior management of the Company, as well as the powers available to each of them as a result of these memberships, the Defendants each had access to internal corporate documents, conversations, and connections with other corporate officers and employees, attended management and Board meetings, and committees thereof, and was provided with reports and other information about the Company prior to their public dissemination.

182.     Accordingly, and because of their positions of trust, loyalty, and fidelity to Moody's, Defendants knew or should have known:  (a) the adverse, material information about the business of

Moody's that they failed to disclose to the investing public, which subjected the Company to lawsuits by shareholders; (b) the true state of affairs at Moody's as to which they caused the Company to affirmatively offer false and misleading guidance to investors (including the dissemination of false press releases and false filings with the SEC throughout the Relevant Period); (c) the nature of their fiduciary duties to Moody's, including the duties that the Company required of them, and their active breach of those very same duties; (d) the absence of any meaningful internal controls and procedures that would have prevented Defendants' destruction of the integrity of the credit rating process at Moody's, along with substantially all of its reputational capital; (e) the waste of Company assets represented by Moody's decision to pay Defendants lavish salaries, bonuses, and other compensation even though they had caused great harm to the Company; and (f) the conflicts of interests among themselves which caused Defendants to act in their own self-interest and contrary to the interests of Moody's.

183.    At all relevant times, the Defendants individually and collectively engaged in a course of conduct that was consciously designed to and did:  (a) enhance the Defendants' directorial and managerial positions at Moody's, as well as the power and prestige accruing to Defendants as a result of holding those positions, and transfer exorbitant unearned and wasteful sums of money to themselves; (b) expose Moody's to a liability for Defendants' conscious destruction of the integrity of the credit rating process at Moody's, along with substantially all of its reputational capital, and their exposure of the Company to government investigations, lawsuits, and the need to respond thereto and pay significant legal defenses preparing for and defending against such proceedings; (c) conceal the fact that the Company was grossly misrepresenting its financial results in order to allow Defendants to conceal the Company's liability arising from their destruction of the integrity of the

credit rating process at Moody's, along with substantially all of its reputational capital, at least long enough to allow certain Defendants to pay themselves enormous bonuses for 2007, and all Defendants' substantial bonuses and other compensation; and (d) otherwise deceive the investing public, including Moody's own shareholders, as to the Defendants' management of Moody's operations, the Company's financial health, stability, the accuracy and integrity of its credit rating processes and internal controls, and its business prospects, exposing the Company to massive damages and incalculable reputational loss among its actual and potential customers and investors.

184.     In committing the wrongful acts alleged herein, Defendants pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided, abetted, and/or assisted one another in breaching their respective duties.

185.     At all relevant times, each of the Defendants was the agent of each of the other Defendants, and was at all times acting within the course and scope of such agency.

186.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

187.     Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing on April 1, 2006 and continuing thereafter in connection with their destruction of the integrity of the credit rating process at Moody's, along with substantially all of its reputational

capital, as well as the Company's financial statements and other statements regarding Moody's performance and financial condition.  During this time, Defendants caused Moody's to conceal the true fact that they had caused the Company to destroy the integrity of the credit rating process at Moody's, along with substantially all of its reputational capital.  In addition, Defendants also made specific, improper statements about Moody's financial performance, and its future business prospects, throughout the Relevant Period.

188.    The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of federal and state law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Moody's common stock so they could, among other things: (i) usurp tens of millions of dollars in unearned bonus, salaries, stock awards, and other emoluments, and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## CLAIMS FOR RELIEF

### COUNT I

### Against All Defendants for Breach of Fiduciary Duties

189.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.    Defendants owed and owe Moody's fiduciary duties.  By reason of their fiduciary relationships, the Officer Defendants and the Director Defendants owed and owe Moody's the highest obligations of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care.

191.    Defendants, and each of them, violated and breached their fiduciary duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care .  Each of the Defendants had actual or constructive knowledge that Defendants had destroyed the integrity of the credit rating process at Moody's, along with substantially all of its reputational capital.

192.    Defendants consciously failed to implement an effective system of internal controls over its credit rating policies and procedures and/or consciously failed to oversee the operations of such control systems.

193.    Defendants knowingly caused or allowed the Company's financial statements to be materially misstated due to Defendants' knowing pretense that its credit rating processes continued to have integrity.

194.    Defendants failed in good faith to supervise, and to exert internal controls over,  and consciously disregarded responsibilities involving the Company's credit rating policies, procedures, and methodologies.

195.    Defendants also knowingly caused Moody's financial statements during the Relevant Period to be materially misleading and not prepared in accordance with GAAP principles.

196.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Moody's has sustained significant damages.  As a result of the misconduct alleged herein, each of the Defendants is liable to the Company.

197.    The Retirement System on behalf of Moody's has no adequate remedy at law.

## COUNT II

### Against All Defendants for Abuse of Control

198.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

199.    Defendants' misconduct alleged herein constituted an abuse of their responsibility to control and influence Moody's, for which they are legally liable. Among these abuses of control were:

(i)    Defendants' failure to in good faith to supervise or exert internal controls over, and their conscious disregard of responsibilities involving, the Company's operations with respect to its credit rating policies and procedures, and their knowing failure to disclose the true status of the credit rating processes, internal controls, accounting, operational and financial condition of the Company;

(ii)    Defendants' knowingly causing or allowing Moody's to prepare and publish financial statements that were materially misstated due to Defendants' concealment of their destruction of the integrity of the credit rating process at Moody's, along with substantially all of its reputational capital; and

(iii)    Defendants' knowingly causing, allowing and/or arranging the payment of millions of dollars in improper salaries, bonuses, and other compensation – at a time when, as a direct and foreseeable consequence of their wrongdoing, the Company was exposed to tens of billions of dollars in losses;

200.    As a direct and proximate result of Defendants' abuse of control, Moody's has sustained significant damages.

201.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

202.    The Retirement System on behalf of Moody's has no adequate remedy at law.

### COUNT III

### Against All Defendants for Gross Mismanagement

203.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

204.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Moody's in a manner consistent with the operations of a publicly held corporation.

205.    Defendants caused or allowed Moody's to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts.

206.    Defendants caused or allowed the Company's financial statements to be materially misstated due to Defendants' knowing destruction of the integrity of the credit rating process at Moody's, along with substantially all of its reputational capital.

207.    Based on the foregoing, Defendants caused or allowed Moody's financial statements to be materially misleading and not prepared in accordance with GAAP principles during the Relevant Period.

208.    As a direct and proximate result of Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Moody's has sustained significant damages in the tens of billions of dollars.

209.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

210.    The Retirement System on behalf of Moody's has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Waste of Corporate Assets

211.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

212.    By failing to properly consider the interests of the Company and its public shareholders, and by failing to conduct proper supervision, Defendants have caused Moody's to waste valuable corporate assets by paying incentive-based bonuses and unearned severance payments to executives who were terminated in connection with the credit rating debacle, including defendant Clarkson, who was allowed to resign with full retirement benefits, including early vesting of his restricted stock, instead of being terminated for cause.  In addition to acting recklessly or negligently and without regard to the financial condition of the Company, Defendants also paid dividends on the Company's stock (for example, declaring a dividend of 8 cents per share on April

24, 2007) at a time when the Company was forecasting drastically lowered revenues for the future and, in fact, stood to lose tens of billions of dollars in the future.

213.    Defendants were willing to and did cause Moody's to engage in this massive waste of corporate assets and pay retirement and dividends at a time when the Company could clearly not afford to pay either.

214.    As a result of the waste of corporate assets, Defendants are liable to the Company.

215.    The Retirement System on behalf of Moody's has no adequate remedy at law.

## COUNT V

### Against All Defendants for Unjust Enrichment and Insider Selling

216.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

217.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Moody's.

218.    The Retirement System, as a shareholder and representative of Moody's, seeks restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants and each of them from their wrongful conduct and fiduciary breaches.

219.    In addition, at the time of each of the stock sales set forth herein, each of the Insider Selling Defendants knew, but did not disclose publicly, the material information described herein. Each of the Insider Selling Defendants made each of his or her sales of stock between April 1, 2006 and the present on the basis of and because of his or her knowledge of this material, non-public information.

220.    At the time of their stock sales, each of the Insider Selling Defendants knew that when the material information described herein was publicly disclosed, the price of the Company's stock would dramatically decrease.  These defendants' sales of Moody's common stock based on their knowledge of the material, non-public information was a breach of their fiduciary duties of loyalty and good faith.

221.    As a result of this misconduct, the Insider Selling Defendants are liable to the Company.  The Company is entitled to have a constructive trust imposed on any proceeds obtained by these defendants obtained thereby.

222.    The Retirement System on behalf of Moody's has no adequate remedy at law.

## COUNT VI

### Derivatively Against All Defendants for Violation of § 10(b)
### of the Exchange Act and Rule 10b-5 Promulgated Thereunder

223.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

224.    Throughout the Relevant Period, Defendants, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and shareholders in connection with their purchases of Moody's during the Relevant Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

225.     Defendants, as the most senior officers and/or members of the Board of Directors of Moody's and various Committees of the Board during the Relevant Period, are liable as direct participants in all of the wrongs complained of herein.  Through their positions of control and authority, Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the Company, including the contents of all its public filings and reports and press releases, as more particularly set forth above.  In addition, certain of these false and misleading statements constitute "group published information," which Defendants were responsible for creating.

226.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts.  Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing the Company's true financial and operating condition from shareholders and supporting an artificially inflated price of the Company's common stock.

227.     Defendants had the motive and opportunity to commit fraud.  By virtue of their positions of control over the entire management of the Company, the Director Defendants had unquestioned opportunity to issue statements that they knew were false and misleading.  Each of the Officer Defendants had direct operative control over the Company's practices in the credit rating process.  Each of the Defendants had the motive to mislead investors as to the Company's true exposure to these instruments, because, among other things:

(a)    During the Relevant Period, each of the Officer Defendants wanted to paint a picture of Moody's as being as profitable as possible so as to ensure the maximum possible bonus and other performance-based compensation for the fiscal year; accordingly, each of these Defendants was motivated to conceal the Company's true exposure to harm from their destruction of the integrity of the credit rating process at the Company;

(b)    In particular, each of the Officer Defendants received significant compensation including a program of bonuses when Moody's reached certain financial and earnings targets.  The target bonuses rewarded executives on a variety of factors, including the size of the Company's revenues from credit ratings given to structured finance securities. The Officer Defendants, therefore, understood that announcing that Moody's stood to lose billions of dollars from revelation that the credit rating process at Moody's had been destroyed at their hands, and that the Company had manipulated the market to deceive its own customers on that topic, would directly and negatively impact their bonuses;

(c)    Defendants further benefited from high stock prices for Moody's when they sold the stock they received through stock, option, and other awards.  As set forth *supra*, since April 1, 2006, Defendants sold millions of dollars worth of Company stock.  If Defendants had caused the Company to report losses in a timely manner, the stock price would have fallen and the amount of money Defendants received from their stock price correspondingly would have decreased by 65 percent or more;

(d)    In addition, each of the Defendants, by virtue of being a shareholder of Moody's, was motivated to conceal the Company's exposure to losses and other liabilities in

connection with their destruction of the credit rating process so as to maintain an artificially high price for the Company's stock;

(e)     Defendants were motivated to overstate Moody's financial results, and keep its stock price high, so as to protect their positions of power, authority, prestige, and personal remuneration at the Company, including out-sized salaries, directors' fees, stock awards, and other emoluments worth multiple millions of dollars; and

(f)     Defendants, as a result of repeated warnings from within and without the Company, were on notice no later than July 2007 that their practices in managing the credit rating process at Moody's were fraudulent and manipulative, yet did not take steps to change them, preferring instead to retain the profits from such illegal market manipulation.

228.     Defendants McDaniel, Huber, Wulff, Anderson, Glauber, Kist, McGillicuddy, McKinnell, and Newcomb signed certifications to various Forms 10-Q and 10-K filed publicly with the SEC during the Relevant Period, attesting that they had reviewed the reports and based on their knowledge, there were no untrue statements of material fact or omissions of material fact necessary to make the statement made, in light of the circumstances under which the statements were made, not misleading.

229.     The Company repurchased shares of its common stock during the Relevant Period, pursuant to a share repurchase program in the amount of $2 billion announced on August 1, 2007.  In purchasing its stock, the Company or its shareholders relied upon the Defendants' statements and/or the integrity of the market in making their purchases.

230.     Accordingly, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Moody's and others in connection with their purchases of Moody's common stock during the Relevant Period.

231.    As a result of Defendants' misconduct, Moody's has suffered and will suffer damages in that it paid artificially inflated prices for Moody's common stock purchased on the open market. Moody's would not have purchased Moody's common stock at the prices it paid had the market been aware that the market price of Moody's stock was artificially and falsely inflated by Defendants' misleading statements.  As a direct and proximate result of Defendants' wrongful conduct, Moody's suffered damages in connection with its purchases of Moody's common stock during the relevant period.  By reason of such conduct, Defendants are liable to the Company.

232.    The Retirement System on behalf of Moody's has no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, the Retirement System demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of federal law;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets until the Company can recoup all of the monies improperly transferred to Defendants, and the proceeds to the Insider Selling Defendants from their sales of Company common stock based on material, non-public information, so as to assure that the Retirement System on behalf of Moody's has an effective remedy;

C.    Declaring that the Defendants are liable under of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Moody's damages;

D.    Declaring that Defendants' improper payments to themselves through the Company's coffers of unearned bonuses, compensation, stock awards, fees, and other illicit transfers – as well as any assets or property acquired with such payments – be held in constructive trust for the Company's benefit;

E.    Awarding to Moody's restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other monies obtained by Defendants;

F.    Directing Moody's to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Moody's and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)    implementing procedures whereby the publication of any credit rating by the Company is accompanied by a prominent disclosure statement indicating how the Company

was compensated for the rating, including whether or not the Company received any compensation from an issuer, broker, dealer, or other party who received proceeds of the security being rated;

(ii)    implementing a long-term business plan in which the Company's revenues from "investor paid" engagements is increased from its current *de minimis* amount to 50 percent of the Company's revenues within ten (10) years, and guaranteeing that "investor paid" revenue always constitutes the majority of the Company's revenues;

(iii)    expanding the Board to thirteen (13) members and filling the five (5) additional seats with nominees proposed by shareholders and chosen in a special election;

(iv)    replacing completely the current memberships of the Audit Committee and the Governance and Compensation Committee;

(v)    establishing enhanced minimum qualifications for members of the Audit Committee and the Governance and Compensation Committee;

(vi)    establishing a Board-level committee to analyze, monitor, and eliminate conflicts of interest that impair the accuracy and integrity of credit ratings awarded by the Company;

(vii)    terminating the employment of defendant McDaniel for cause; and

(viii)    establishing a special committee of the Board to conduct an investigation into the identity of key employees responsible for the Company's issuance of compromised credit ratings in each investment category and empowering the special committee to make recommendations for the termination or other discipline of the employees so identified.

G.     Awarding the Retirement System the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.     Granting such other and further relief as the Court deems just and proper

**<u>JURY DEMAND</u>**

The Retirement System demands a trial by jury.

Dated:  October 28, 2008

KAHN GAUTHIER SWICK, LLC

_____

Lewis S. Kahn
Albert M. Myers (a member of the bar of this Court)
Kevin Oufnac
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498
*lewis.kahn@kgscounsel.com*
*albert.myers@kgscounsel.com*
*kevin.oufnac@kgscounsel.com*

Michael Swick (a member of the bar of this Court)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile:  (504) 455-1498
*michael.swick@kgscounsel.com*

***Attorneys for Plaintiff the Louisiana Municipal Police Employees Retirement System***

# APPENDIX A

## Specific misstatements referred to in ¶ 153

**(a)**

Code of Professional Conduct, adopted June 2005, maintained on Company website:

> p. 7: "In the rating process, MIS maintains independence in its relationships with Issuers and other interested entities."

> p. 7: "As a matter of policy, and in keeping with its role as an independent and objective publisher of opinions . . ."

December 2006 Code of Business Conduct, maintained on Company website:

> p. 17: "Moody's long-established internal policies to mitigate conflicts of interest are essential for our credibility in the market and the independence of our employees."

2006 Form 10-K (Feb. 28, 2007) filed publicly with SEC:

> p. 2: "Moody's credit ratings and research help investors analyze the credit risks associated with fixed-income securities. Such independent credit ratings and research also contribute to efficiencies in markets for other obligations, such as insurance policies and derivative transactions, by providing credible and independent assessments of credit risk."

2006 Annual Report distributed to shareholders in March 2007:

> p. 10: "Moody's is a "standards" business: public and private sector organizations worldwide rely on the accuracy, stability, consistency and independence of our opinions and services for the contribution they make to fair and efficient financial markets."

> p. 25: "Looking ahead, we believe that additional opportunities exist to leverage Moody's position as a trusted provider of independent research and opinions, and further inform investors' trading, security selection, and portfolio management decisions."

October 23, 2007, Press Release ("Moody's Investors Service Updates Its Code of Professional Conduct"):

> "'The MIS Code provides important transparency in how Moody's Investors Service manages potential conflicts of interest in the ratings business,' said Brian Clarkson, President and Chief Operating Officer of Moody's Investors Service. 'We will continue to consider additional measures to further demonstrate the independence of our rating process.'

2007 Form 10-K (Feb. 29, 2008) filed publicly with SEC:

p. 2: "Moody's credit ratings and research help investors analyze the credit risks associated with fixed-income securities and other credit-sensitive instruments. Such independent credit ratings and research also contribute to efficiencies in markets for other obligations, such as insurance policies and derivative transactions, by providing credible and independent assessments of credit risk."

2007 Annual Report distributed to shareholders in March 2008:

p. 3: "Moody's strongly rejects assertions that our work is compromised by any failure of integrity or a lack of independence in our processes."

p. 5: " Beyond this difficult cyclical period, we have confidence that the markets we serve will continue to grow and the demand for independent expertise in assessing credit and fostering consistent, comparative standards for credit should also grow accordingly."

p. 8: "As the President and Chief Operating Officer of Moody's Investors Service, I am privileged to lead an organization that has been a provider of independent credit opinion and insight to the global financial markets for over 100 years." [Clarkson]

July 1, 2008, Press Release ("Moody's Investors Service Announced Actions After Review of European CPDO Ratings Process"):

"As part of its broader ratings quality and disclosure initiatives and in response to this incident, Moody's has introduced or enhanced its actions in five broad areas.

1. Disciplinary proceedings: Moody's has initiated disciplinary proceedings against certain employees who were involved in the CPDO monitoring process and its supervision. The company is proceeding with the disciplinary process in accordance with the relevant legal requirements of the countries in which the employees reside. Penalties could include termination of employment.

2. Existing CPDO ratings: To confirm the integrity of existing CPDO ratings, the company has conducted a review of all outstanding static CPDOs, including the seven affected by the model error. (See Moody's press release, "Moody's Takes Rating Actions on 13 Series of Static CPDO Notes.") Moody's is also reviewing ratings of certain other structured finance securities in which employees subject to the disciplinary process participated substantively. To date, the review effort has found no indications that the rating process for those securities violated Moody's Code.

3. Review of analytical models and methodologies: Moody's is taking additional steps to enhance the independence of model verification and methodology review. Verification of several models is already complete and no errors have been found. Moody's also has instituted new procedures to clarify the steps taken if a model error is discovered, including specifying that a model error impacting outstanding ratings must be disclosed.

4. Monitoring of structured finance ratings: As previously announced, Moody's has enhanced resources devoted to an independent surveillance of its structured finance ratings. This effort will be fully implemented by the end of 2008 and will unify leadership and accountability for monitoring. In addition, Moody's is changing the composition of monitoring committees to include more independent analysts and further increase independence of the monitoring process from the initial rating committee.

5. Global compliance: Moody's also is continuing its build-out of the global compliance function to improve training and bolster monitoring of adherence to policies. This will supplement the existing training related to the Moody's Code of Conduct required of all Moody's analysts."

**(b)**

April 12, 2006, Report on Implementation of Code of Professional Conduct, maintained on Company website:

"**B. Independence and Management of Conflicts of Interest**

In 2005, Moody's derived approximately 87% of our revenue from Issuer payments for Credit Ratings, and virtually all of the remainder from sales of credit research and data products. The Issuer fee-based structure of the rating business serves the public policy objective of broad, contemporaneous dissemination of Credit Rating opinions to the public without charge. However, we recognize that this business model entails potential conflicts of interest that could impact the independence and objectivity of our rating process, such as those that exist with financial news publications that accept advertising business from companies about which they report. We also recognize that potential conflicts of interest arising from other sources, such as securities ownership and business and personal relationships, could similarly impact our rating process. To maintain our objectivity and independence, and to protect the integrity of our Credit Ratings and rating process, we have adopted policies and procedures at a company level as well as at the level of the individual rating and the Employee, including those discussed in this section.

* * *

*3. Rating Committee*
The rating committee, discussed above in Section II.A.4.b, is one of Moody's most important control mechanisms for managing potential conflicts of interest and protecting the integrity of the rating process. The rating committee helps to minimize the potential for conflicts of interest by, for example, prohibiting conflicted individuals from committee participation. As discussed above, Moody's *Core Principles* provide that an Analyst be excluded from the relevant rating committee if he or she: (i) owns the Issuer's securities; (ii) has had a recent employment or other business relationship with the Issuer; (iii) has an immediate relative who works for the Issuer; or (iv) has any other relationship with the Issuer or agent that may be perceived as presenting a conflict. Rating committees generally begin with an inquiry by

the Chair to ensure that none of the participants are conflicted. Moreover, because a majority vote is required for a rating action, the committee is the ultimate decision-maker, thereby limiting the influence of any one individual.

### 4. Analysts

Moody's takes a number of steps to eliminate or manage potential conflicts of interest at the Analyst level. As discussed below in Section III.B.2, Analysts without management responsibility are not involved in discussions with Issuers or their agents regarding fees or payment. Such matters are handled by separate Moody's issuer and intermediary relations personnel (who are not involved in the rating process) or Analysts with management responsibility. Analysts also are prohibited from selling research or data products, although they may be called upon from time to time to explain certain aspects of these products to Moody's research customers."

2006 Annual Report distributed to shareholders in March 2007

> p. 31: "The Code of Professional Conduct, which Moody's introduced in 2005 pursuant to the model international code, seeks to enhance market understanding and confidence in our credit ratings by setting out:
> • Moody's commitment to maintaining the quality and integrity of the rating process;
> • The policies and controls to ensure that we maintain our independence and properly manage potential conflicts of interest; and
> • Moody's responsibilities to investors and issuers . . . ."

2007 Annual Report distributed to shareholders in March 2008:

> p. 3: "Finally, Moody's strongly rejects assertions that our work is compromised by any failure of integrity or a lack of independence in our processes. For example, in the wake of recent events some observers claim that conflicts of interest have influenced our business because we receive fees from rated issuers. . . . At Moody's, we have taken a leadership position in setting industry standards regarding the management of potential conflicts. Our Code of Professional Conduct sets forth rigorous procedures that govern the roles and responsibilities of our rating agency employees, with the primary goal of ensuring that our analytical activities remain appropriately distanced from the commercial management of our business. Oversight by our internal Compliance Department as well as external examination by government authorities serves to reinforce, validate and improve our controls and procedures. Most importantly, however, our employees participate in a culture of integrity that is informed by the responsibilities and traditions developed over more than 100 years of contribution to strong capital markets."

October 23, 2007, Press Release ("Moody's Investors Service Updates its Code of Professional Conduct"):

> "'The MIS Code provides important transparency in how Moody's Investors Service manages potential conflicts of interest in the ratings business,' said Brian Clarkson, President

and Chief Operating Officer of Moody's Investors Service. 'We will continue to consider additional measures to further demonstrate the independence of our rating process.'"

**(c)**

Code of Professional Conduct, adopted June 2005, maintained on Company website:

> p. 7: "MIS does not participate in the actual structuring of any security under consideration for a Credit Rating."

**(d)**

April 12, 2006, Report on Implementation of Code of Professional Conduct, maintained on Company website:

> p. 2: "We use globally consistent rating symbols and definitions to communicate our rating opinions, and we have implemented policies and procedures to promote broad consistency in our overall rating methodologies and practices as well as global comparability in our Credit Ratings."

**(e)**

Code of Professional Conduct, adopted June 2005, maintained on Company website:

> p. 9: "Credit Ratings will reflect consideration of all information known, and believed to be relevant, by the applicable MIS analyst and rating committee, in a manner generally consistent with MIS's published methodologies."

April 12, 2006, Report on Implementation of Code of Professional Conduct, maintained on Company website:

> p. 7: "The Analyst or Analysts assigned to a particular Issuer or obligation ("Assigned Analyst") begins the credit analysis by assembling relevant information on the Issuer or obligation."

**(f)**

Code of Professional Conduct, adopted June 2005, maintained on Company website

> p. 11: "The Credit Rating MIS assigns to an Issuer or obligation will not be affected by the existence of, or potential for, a business relationship between MIS (or its affiliates) and the Issuer (or its affiliates) or any other party, or the non-existence of any such relationship."

April 12, 2006, Report on Implementation of Code of Professional Conduct, maintained on Company website:

p. 15: "We also recognize that potential conflicts of interest arising from other sources, such as securities ownership and business and personal relationships, could similarly impact our rating process. To maintain our objectivity and independence, and to protect the integrity of our Credit Ratings and rating process, we have adopted policies and procedures at a company level as well as at the level of the individual rating and the Employee, including those discussed in this section."

p. 17: "As discussed above, Moody's *Core Principles* provide that an Analyst be excluded from the relevant rating committee if he or she: (i) owns the Issuer's securities; (ii) has had a recent employment or other business relationship with the Issuer; (iii) has an immediate relative who works for the Issuer; or (iv) has any other relationship with the Issuer or agent that may be perceived as presenting a conflict."

**(g)**

2007 Annual Report distributed to shareholders in March 2008:

p. 4: "It is important that innovative financial products regain investor (and regulatory) confidence, and Moody's will continue to play a central role in providing insight that facilitates market acceptance of new financial technology."

p. 14: "As Moody's operations have grown in size and geographic scope, the company has made a concerted effort to establish and maintain constructive relationships with regulators, legislators and policymakers around the world. Our goal is to understand the needs and expectations of authorities as we play our part in supporting the efficiency and soundness of global financial markets.

At the same time, we must preserve Moody's independence and integrity, the cornerstones of our business. To this effect, we focus on three important activities:

• First, we communicate with national authorities in both established and developing capital markets to better understand and consider their unique issues and concerns.

• Second, we interact with international regulatory associations (such as the International Organization of Securities Commissions, or "IOSCO") and regional authorities (such as the Committee of European Securities Regulators, or "CESR ") to achieve a similar level of understanding of pannational regulatory perspectives.

• Finally, we are in continuous dialogue with market participants around the world so that our regulatory positions are informed by existing and developing market conditions.

Moody's global Regulatory Affairs team is composed of highly skilled professionals with the insight and cross-disciplinary expertise to formulate practical, forward-looking solutions. Our mandate is to work toward constructive and durable outcomes that facilitate Moody's contribution to the efficiency and function of global capital markets."

2006 Annual Report distributed to shareholders in March 2007:

pp. 8-9: "STRATEGIC INITIATIVES REPORT CARD

We made good progress in 2006 against our strategic initiatives. To answer more specifically the question of how Moody's is meeting these business challenges, below is a "report card" on our key investment and development initiatives:

\* \* \*

• Communicating openly with global policymakers and regulatory authorities about the role and function of credit ratings in the capital markets. In September, President Bush signed into law the Credit Rating Agency Reform Act. The Reform Act addresses the interests and concerns of market participants in preserving standards of quality and independence in credit ratings, while facilitating additional oversight by the Securities and Exchange Commission. Overall, we view passage of the Reform Act as a positive development. We anticipate that it will help preserve the proper functioning of our industry, while increasing the market's confidence in the industry's integrity, independence and competence."

## VERIFICATION

I, Kathy Bourque, am the Director of the Louisiana Municipal Police Employees' Retirement System (MPERS). I declare that I have reviewed the Shareholder's Derivative Complaint in the case captioned *Louisiana Municipal Police Employees' Retirement System v. Raymond W. McDaniel Jr., et. al.*, S.D.N.Y., and I authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason, I believe them to be true. I further declare that MPERS is a current owner of Moody's Corp. common stock and has been an owner of such stock from at least April 2006 to the present.

October 28th, 2008.

_____

Kathy Bourque
Director, Louisiana Municipal Police Employees'
Retirement System
7722 Office Park Blvd., Suite 200
Baton Rouge, LA 70809